NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

———————————————

5th Circuit Court – Newport Family Division
No. 2014-0023

IN RE C.M. & a.

Argued: June 26, 2014
Opinion Issued: September 30, 2014

Joseph A. Foster, attorney general (Rosemary Wiant, assistant attorney general, on the memorandum of law and orally), for the petitioner.

Barbara L. Parker, of Newport, on the brief and orally, for respondent Larry M.

Simpson and Mulligan, P.L.L.C., of Lebanon (James L. Mulligan, on the brief and orally), for respondent Sonia M.

LYNN, J. The respondents, Larry M. (Larry) and Sonia M. (Sonia), appeal the order of the Circuit Court (Cardello, J.), terminating their parental rights over their children, A.M. and C.M. See RSA ch. 170-C (2014). On appeal, Larry argues that the trial court erred by: (1) proceeding with the termination case based on an underlying neglect case in which he was improperly denied counsel; and (2) finding that termination of his parental rights was in the best interests of the children. Sonia argues that the court erred because: (3) the trial judge did not recuse himself despite the fact that he presided over the

underlying neglect case in the circuit court. Both respondents argue that the court erred by: (4) failing to afford them twelve months from the superior court's de novo finding of neglect within which to correct the conditions which led to the finding of neglect; and (5) finding that the petitioner, the New Hampshire Division for Children, Youth and Families (DCYF), made reasonable efforts to assist them in correcting the conditions that led to the neglect finding. We affirm.

I

The following facts are supported by the record or are not in dispute. On April 12, 2011, DCYF initiated proceedings in the circuit court against Larry and Sonia, alleging that they had neglected their children by failing to provide them with a safe and sanitary home and adequate supervision, and by exposing them to household domestic violence. See RSA 169-C:7 (2014). The court granted DCYF temporary custody of the children, see RSA 169-C:6, :6-a (2014), and, pursuant to the law in effect at that time, see RSA 169-C:10, II(a) (2002) (repealed 2011; re-enacted 2013), appointed counsel to represent each parent. An adjudicatory hearing was held on May 12, at which the parents were represented by appointed counsel. See RSA 169-C:18 (2014). Following the hearing, the Circuit Court (Cardello, J.) found that both parents had neglected the children and continued the order granting legal custody to DCYF. Both parents also were represented by appointed counsel at the dispositional hearing held on June 13. After this hearing, the court ordered that the children remain in the legal custody of DCYF and set forth specific measures that the parents were to undertake before the children could be returned to them.

Both parents appealed to the superior court, and a de novo hearing was scheduled for August. See RSA 169-C:28 (2014). In the interim, on July 1, 2011, Laws 2011, 224:77 took effect. This legislation amended RSA 169-C:10, II(a), so as to abolish the statutory right to counsel for an indigent parent alleged to have abused or neglected his or her child. Thereafter, the parents each filed a motion to continue to be represented by court-appointed counsel, asserting that such representation was mandated by the State and Federal Constitutions. The superior court approved an interlocutory transfer of these constitutional issues to this court, and we subsequently held in In re C.M., 163 N.H. 768 (2012), that although the State and Federal Constitutions did not guarantee the right to court-appointed counsel to every indigent parent accused of abusing or neglecting his or her child, such a right may exist under the facts and circumstances of a particular case. See In re C.M., 163 N.H. at 777-78. We remanded to the superior court to determine whether appointment of counsel for either or both parents was constitutionally required in this case. Id. at 778.

2

On remand, the Superior Court (<u>Tucker</u>, J.) determined that neither Larry nor Sonia was constitutionally entitled to appointed counsel. The court found that Sonia is a high school graduate who had received special education services while in school, that she had completed the requirements for a licensed practical nurse certificate, and that she suffers from severe depression. The court found that Larry is partially disabled and blind in one eye and that he received special education assistance while in school. Despite their limitations, the court found that the parents were capable of understanding and responding to the allegations in the petition. The court noted that the case did not present particularly complex legal issues or expert testimony, examples of circumstances which our <u>C.M.</u> opinion indicated might require the appointment of counsel for an accused parent. <u>See</u> <u>id</u>. at 777. Rather, the court found that the case was straightforward, involving allegations that the parents failed to provide adequate food and clothing for the children, that they were subjected to unclean living conditions, and that they were exposed to physical violence between the parents. The court also found that the parents' purported defense — lack of financial resources to provide for the children — was not so complex as to be difficult for them to explain. With the assistance of counsel, the parents moved for reconsideration of the order denying them appointed counsel. The court denied the motion, and neither parent appealed that ruling.

Following a <u>de novo</u> hearing, the superior court issued its adjudicatory order on January 16, 2013. The court found that Larry and Sonia had neglected C.M. (then age eight) and A.M. (then age six) and ordered that the children remain in the custody of DCYF. The court found that Larry took a "hands-off approach" to parenting, leaving such responsibilities to Sonia, even after he was confronted with an investigation into the home situation. He engaged only sporadically with a parent educator from the Good Beginnings program when she sought to help the parents develop the skills necessary to maintain a proper level of parental care and control. He blamed Sonia for not keeping him apprised of appointments with Good Beginnings, but also acknowledged that he made no efforts on his own to learn of the meeting times. The court found that Sonia had "difficulty meeting her obligations as, in effect, a single parent to her two boys." Although she attended meetings with the representative of Good Beginnings, she also missed scheduled appointments. She suffers from depression, but stopped seeing a doctor for this condition after he denied her medication on her first visit.

The court recited evidence adduced at the hearing showing that: (1) Larry was physically violent with Sonia in front of the children, including an incident in which the police were called because he had been trying to choke her; (2) the household was chaotic, permeated with the smell of garbage and cigarette smoke; (3) the children were regularly left unattended and free to engage in mischief, on one occasion pulling a fire alarm, on another throwing beer bottles out the window, and on yet another, watching an adult video

depicting shooting and killing; and (4) Sonia left C.M. at home alone while she took a long walk to court with A.M. in order to attempt to have lifted a restraining order she had obtained against Larry.  The court also referenced the testimony of more than one witness that there was little or no food in the home and that the children were lacking in proper hygiene and did not have adequate clothing for the winter.  The court observed that Sonia attributed the absence of food and medicine in the home to the fact that she had neglected to submit paperwork necessary to obtain public assistance.  The court found that neither parent works and that Sonia's lack of employment was apparently based on her choice to stay at home.

Additionally, the court found that neither parent ensures that the children attend school.  In a period of approximately three months, C.M. had over twenty unexcused absences from his first grade class, as a result of which his academic progress suffered, and he was deprived of the opportunity to eat breakfast provided by the school.  Calls to C.M.'s home to inquire about the absences were not returned.  A.M. started school at Head Start but lost his placement with that program due to continual absences.  Although Sonia attributed the school absences to lack of transportation, she admitted to a DCYF worker that she had trouble getting the children to bed and that they often remained awake until past midnight.  The worker said that the children appeared exhausted.

The court's narrative order summarized as follows:

It was shown that the parents neglect to provide the children with certain necessities, including adequate food and clothing.  While there are monetary issues to be sure, the parents use the income they have on cigarettes.  It is not clear whether Larry . . . is able to work, but Sonia has been employed and now chooses to stay home.  The parents have not been diligent in obtaining public assistance, despite efforts by others to assist them in doing so.

The parents do not ensure that their boys attend school.  Sonia . . . contends it is due to transportation problems, but the evidence was that the parents have not responded to attempts by representatives of Head Start and the town . . . to address the issue.  The evidence suggests further that transportation is not the only impediment to school attendance.  Due to a lack of parental control, the children keep late hours and, by implication, lack sufficient sleep to begin the school day on time.

A third sign of neglect is the home environment.  Sonia . . . resisted efforts to convince her to relocate to a domestic violence shelter in order to remove the children and herself from threatening conduct by Larry . . . .

4

In sum, [C.M.] and [A.M.] require a greater degree of care or control than Larry and Sonia . . . are presently willing or able to provide. This lack of care or control is not due primarily to a lack of financial means.

In its dispositional order entered on February 14, 2013, the superior court imposed upon the parents essentially the same remedial prerequisites as had the circuit court in order for the children to be returned to the parents' custody. Specifically, both parents were required to demonstrate: (1) the parenting skills necessary to provide their children with safety, stability, and supervision appropriate to their developmental stages; (2) the ability to obtain and maintain a safe and sanitary home; and (3) the ability to provide the children access to education. In addition, Sonia was required to demonstrate that she can manage her mental health issues, and Larry was required to demonstrate that he can manage his anger issues. DCYF was ordered to make available case management, child health support, home-based therapy, and individual service options for parenting support and education. The parents were ordered to cooperate in the delivery of these services. The court remanded the case to the circuit court for further proceedings. Neither parent appealed the superior court's final order.

During the twenty-month period while the case was on appeal to the superior court and this court, the circuit court held review hearings approximately every three months. On February 25, 2013, the circuit court held a permanency hearing, after which it directed DCYF to file termination of parental rights petitions against both parents.

DCYF filed the termination petitions on March 21, 2013, asserting as grounds therefore that, following the neglect findings entered against them in the RSA chapter 169-C proceeding, both parents had failed to correct the conditions leading to the findings within twelve months despite reasonable efforts under the direction of the circuit court to rectify the conditions. See RSA 170-C:5, III. In May 2013, Larry filed a "motion to exclude findings." In this motion, he asserted that because, at the time he first appeared in court in the neglect case, he had been provided with a form advising him of his right to be represented by an attorney "at every point in the case and at every court hearing," and because he had applied for and been granted counsel at that time, the subsequent removal of his counsel following the amendment of RSA 169-C:10, II(a) "breached the agreement made by the Court with [him]" and violated his statutory and constitutional rights to an attorney. As relief for the alleged violations, the motion requested that the termination proceeding be dismissed, that the court exclude from evidence the dispositional order and any findings made in the review hearings or the permanency hearing in the neglect case, and/or that the court "give no judicial notice in this termination matter [to] any findings made after counsel was terminated." The court denied this motion.

The Circuit Court (<u>Cardello</u>, J.) held a three-day hearing on the termination petitions in September and October 2013. Pursuant to RSA 170-C:10, both parents were represented by appointed counsel throughout this hearing. Based on the evidence presented, the court found that during the more than twelve-month period since the June 2011 dispositional hearing in the circuit court, "the parents had not obtained safe and stable housing, nor had they followed recommendations and obtained the necessary counseling and treatment." Specifically, the court determined that "[Larry] had not addressed his domestic violence issues, [and Sonia] had not addressed her mental health issues . . . ." The court found that, after the children were placed in foster care[1] in July 2011, DCYF worked with the parents to schedule visits, but they attended those visits inconsistently. During the visits they did attend, the parents required much guidance from a social worker as to how to properly parent and supervise the children. For part of the time between July and November 2011, Larry and Sonia lived in a tent, after being evicted from their apartment. They later moved into a residence with friends, but no visits could be scheduled there because the owner of the property would not permit DCYF to inspect it.

The court further found that Sonia had failed to obtain employment and that after finally separating from Larry in September of 2012, she lived with a series of friends and relatives in accommodations not suitable for her children. Although Sonia attributed much of her non-compliance with court requirements to a lack of transportation, the court found that she failed to take advantage of transportation options that were available to her. In addition, the court found that Sonia failed to apply for Medicaid coverage so that she could obtain medications needed to treat her depression. Although she was referred to the New Hampshire Department of Employment Security for help in finding a job, she participated in its assistance program for only two weeks; she never did get a job and "lost out on" available cash benefits.

Larry failed to appear for his initial evaluation, denying that he had any need for the batterer's intervention program and stating that he was not going to do it. Although he ultimately took some steps to attend counseling, he missed many sessions, also claiming transportation issues as the reason. The court recited testimony from one of the case workers that when Larry and Sonia fought, the children ran to Sonia and cowered. The court found that when Larry was confronted about this, he denied that the children's behavior had anything to do with him or his history of domestic violence. Between May and September 2012, the parents made very little progress toward their treatment goals. DCYF attempted overnight visits of the children with the parents, but stopped them due to conflict between Larry and Sonia, their failures to attend counseling and inability to provide the children with

---

[1] Prior to entering foster care, the children lived with their paternal grandmother, and then their paternal aunt, for approximately three months.

adequate food, and the children's own expressions of concern about their welfare during the overnight visits.  Thereafter, the parents were each scheduled for one visit per week, but Larry missed many of these visits.  It was not until late 2012, nearly eighteen months after the circuit court's dispositional order, and after he had stopped attending monthly team meetings, that Larry finally acknowledged that the children had been adversely affected by their parents' fighting.  Even then, however, he continued to minimize the need for the involvement of counselors and other treatment providers, and he never completed the batterer's intervention program.

After A.M. and C.M. began counseling at West Central Behavioral Health in the summer of 2012, Sonia attended a number of sessions, but Larry never participated.  The counselor opined that both children exhibited evidence of having suffered trauma from neglect, lack of supervision, and exposure to domestic violence.  However, the counselor also testified that the children had improved since they were placed in foster care and were secure and happy in their foster home where their needs were being met and they were being well-cared-for.  The court observed that issues had been raised during the hearing about inappropriate discipline being imposed on the children by the foster parents, but noted that the complaints to this effect were either unresolved or investigated and determined to be unfounded and that both the children's counselor and the DCYF case worker had no concerns about the children living with the foster parents.  Although the children were clearly bonded and "loyal" to their parents, they nonetheless wanted to live with their foster parents.  Despite having some reservations about the foster parents, the children's guardian ad litem (GAL) recommended termination of Larry and Sonia's parental rights as being in the children's best interests.

In concluding its order, the court wrote:

"[The] children have resided with the current foster family since November 2011 (after an earlier 18-month placement there) where they are safe and well-cared-for, and have done well.  These boys deserve the stability and permanency of adoption.  The Court finds beyond a reasonable doubt that these parents have failed to correct the conditions leading to the finding of neglect within 12 months of the finding despite the provision of services by DCYF, parent aides, therapists and others to assist them in correcting the conditions.  And although there was evidence of a continuing bond between the children and their parents, the Court finds beyond a reasonable doubt that termination of [Larry's and Sonia's] parental rights is in the children's best interests.

Both parents filed motions for reconsideration in which they asserted, among other things, that the court erred in denying them appointed counsel in

the superior court neglect proceeding. The court denied these motions, and this appeal followed.

II

We first address the argument advanced by both parents that the trial court erred in finding a basis for termination of their parental rights under RSA 170-C:5, III, because they had not been given a full twelve months to correct the conditions leading to the finding of neglect.

Before a court may order the termination of parental rights, the petitioning party must prove a statutory ground for termination beyond a reasonable doubt. In re Sophia-Marie H., 165 N.H. 332, 335 (2013); see RSA 170-C:5. Once a statutory ground is established, the court must then consider whether termination is in the child's best interest. Sophia-Marie H., 165 N.H. at 336.

RSA 170-C:5, III provides that termination may be ordered when "[t]he parents, subsequent to a finding of child neglect or abuse under RSA 169-C, have failed to correct the conditions leading to such a finding within 12 months of the finding despite reasonable efforts under the direction of the [circuit court] to rectify the conditions." There is no dispute that more than twelve months elapsed between the date the circuit court issued its finding of neglect (May 12, 2011) and the date DCYF filed the petition to terminate parental rights (March 21, 2013). The parents argue, however, that because they appealed the neglect finding to superior court for a de novo hearing pursuant to RSA 169-C:28, the twelve-month period specified in RSA 170-C:5, III runs from the date of the superior court's finding of neglect (January 16, 2013), which was issued only two months before the termination petition was filed. This argument requires us to construe RSA 170-C, III and RSA 169-C:28, a task for which we employ a de novo standard of review. Petition of Carrier, 165 N.H. 719, 720-21 (2013). "In matters of statutory interpretation, we are the final arbiter of the intent of the legislature as expressed in the words of the statute considered as a whole." State Employees' Assoc. of N.H. v. State of N.H., 161 N.H. 730, 738 (2011). "We first look to the language of the statute itself, and, if possible, construe that language according to its plain and ordinary meaning." Id. "We interpret legislative intent from the statute as written and will not consider what the legislature might have said or add language that the legislature did not see fit to include." Id. "We construe all parts of a statute together to effectuate its overall purpose and avoid an absurd or unjust result." Id. "Moreover, we do not consider words and phrases in isolation, but rather within the context of the statute as a whole." Id. "This enables us to better discern the legislature's intent and to interpret statutory language in light of the policy or purpose sought to be advanced by the statutory scheme." Id. at 738-39.

8

The parents' argument is straightforward. They cite our decision in In re Juvenile 2002-511-A, 149 N.H. 592 (2003), in which we explained: "A hearing de novo is defined as: 1. A reviewing court's decision of a matter anew, giving no deference to a lower court's findings. 2. A new hearing of a matter, conducted as if the original hearing had not taken place." Juvenile 2002-511-A, 149 N.H. at 594 (quotations omitted). Based on this definition, they argue that because their de novo appeal to superior court started the neglect proceedings anew, it also restarted the running of the twelve-month period within which they were required to correct the conditions upon which the neglect findings were based. We disagree with the parents' position because construing the statutes in the manner they advocate would be antithetical to the statutory goals. As we have frequently stated, "the dominant consideration in termination proceedings under RSA chapter 170-C is the welfare of the child, which must prevail over the interests of the parents." In re Antonio W., 147 N.H. 408, 412 (2002); see also In re Doe, 123 N.H. 634, 641 (1983).

RSA 169-C:28, I, the section of the Child Protection Act that permits a party aggrieved by a circuit court's final dispositional order in an abuse and neglect proceeding to obtain de novo review in the superior court, specifically provides that "an appeal shall not suspend the order or decision of the [circuit] court unless the court so orders." In addition, the statute directs the superior court to give such appeals "priority on the court calendar." RSA 169-C:28, I. And RSA 169-C:24-a, I(a) (2014) generally requires DCYF to file a petition for termination of parental rights "[w]here a child has been in an out-of-home placement pursuant to a finding of child neglect or abuse, under the responsibility of the state, for 12 of the most recent 22 months." The clear import of these provisions is the legislature's recognition of the need for efforts at family rehabilitation to continue while the superior court appeal is ongoing (unless the court orders otherwise), for the superior court to resolve appeals expeditiously, and for termination proceedings to be instituted promptly in those cases in which reunification of parent and child is not possible — the goal being to provide the child with stable and permanent living arrangements as soon as reasonably possible. See In re Juvenile 2006-674, 156 N.H. 1, 9 (2007) (Dalianis, J., concurring specially) ("Children need and deserve permanent living arrangements."). The foregoing objectives would be substantially frustrated were we to adopt the parents' interpretation that a de novo appeal always restarts the twelve-month clock for corrections of the conditions of neglect or abuse.

The purpose of the de novo appeal provided by RSA 169-C:28 is to give the party aggrieved by the circuit court decision an opportunity for a fresh look at the case by a different judge, who will consider the matter anew, unconstrained by the decision of the first judge. If, after such hearing, the superior court does not find that a child has been neglected or abused, then the circuit court's dispositional orders terminate and can no longer be enforced (unless the superior court, or this court, stays the superior court order pending

an appeal to this court). There may also be circumstances in which the superior court, while agreeing with the circuit court that a child has been neglected or abused, issues a dispositional order that is so substantially at variance with the circuit court's dispositional order, in terms of what the parent must do to correct the conditions of neglect or abuse, that it would be fundamentally unfair not to give the parent the benefit of a full twelve months from the superior court's order to achieve compliance. We need not decide that issue today, however. We conclude that, where, as here, the superior court's dispositional order is virtually identical to that issued by the circuit court, and where the circuit court's order remained in effect and review hearings were held in that court throughout the superior court appeal, there is no sound justification for construing RSA 170-C:5, III so as to prolong the parent's time to achieve compliance to run from the date of the superior court's adjudicatory order. We therefore hold that, in cases such as this one, where the superior court's dispositional order is not significantly different from the circuit court's dispositional order, the twelve-month period specified in RSA 170-C:5, III runs from the date of the circuit court's adjudicatory order.

III

We next address Sonia's contention that Justice Cardello should have disqualified himself from presiding over the termination case because he presided over the neglect proceedings. Sonia argues that because the petition to terminate her rights alleged that she had failed to correct the conditions leading to the finding of neglect within twelve months of the finding "despite reasonable efforts under the direction of the [circuit court] to rectify the conditions," RSA 170-C:5, III (emphasis added), proof of an essential prerequisite to termination "necessarily involves an assessment of the quality of direction provided by the presiding judge" in the neglect case. She continues: "Given that the finder of fact's role in [the termination] proceedings, in part, was to assess the actions of Judge Cardello as the presiding judge . . . in the underlying neglect proceedings he cannot be presumed to act impartially in these proceedings." In effect, Sonia asserts that by presiding in the termination case, Justice Cardello undertook to review his own actions taken in the neglect case.

We acknowledge that by presiding in the termination case Justice Cardello, to some extent at least, was required to review his own actions in the neglect case. However, this circumstance is neither unusual nor sufficient in itself to require the judge's recusal. For example, it is widely accepted that a judge who issues a search warrant is not precluded from presiding over a suppression hearing at which the warrant's validity is determined. See, e.g., Minks v. Com., 427 S.W.3d 802, 808 n.3 (Ky. 2014) (collecting cases). This is merely a manifestation of the broader principle that "[a]dverse rulings against the defendant in the same or a prior judicial proceeding do not render the

judge biased." State v. Bader, 148 N.H. 265, 271 (2002) (quotation omitted). As both this court and the United States Supreme Court have recognized:

> Judicial rulings alone almost never constitute a valid basis for a bias or partiality motion. . . .  Opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible.

Id. (quotation, brackets, and ellipses omitted).

In DYFS v. L.C., 788 A.2d 330 (N.J. Super. Ct. App. Div. 2002), the court considered a challenge similar to that advanced by Sonia here — that it was improper for the same judge to preside in both the abuse-neglect proceeding and the termination proceeding involving the same family.  The court rejected the argument that the Code of Judicial Conduct precluded the same judge from hearing both cases, explaining:

> There is . . . a . . . significant policy justification for one judge hearing both matters.  In [N. J. Youth & Family Services v. K.M., 643 A.2d 987 (N.J. 1994)], the Court commented on the need to coordinate and expedite both the [protective services] and [termination] cases.  The Court also acknowledged the traditional notion of one court/one family, not in the context of depriving a defendant of due process but, to the contrary, eliminating defendant's burden to defend in two forums issues that could be resolved with one counsel and, ultimately, one judge sufficiently familiar with a family so as to expedite matters.  We are neither unmindful of nor do we minimize a defendant's due process concerns, but judges are constantly required to adjudicate matters involving parties and related disputes which have come before the judge in a different proceeding.  Judges are perfectly capable of recognizing the different issues involved, different standards of proof required and different remedies sought without "prejudging" a defendant so as to implicate due process concerns.  Ultimately, the issue to be determined is the future of the children protected by the statutory and judicial schemes at issue.  Fully cognizant of a judge's sworn responsibility under the constitution and the law, we fail to see that either the cited rule or canon bars a judge from adjudicating both the [protective services case and termination] case. Ultimately the judge, on appropriate application from a litigant, must consider whether her involvement in a case warrants that judge recusing herself from further consideration of the

11

issues. But we find no basis to conclude that a per se rule, which is being urged here, is warranted.

L.C., 788 A.2d at 333 (quotation and citation omitted). We find the L.C. court's reasoning compelling, and, in the absence of any allegation that the record demonstrates a particularized "deep-seated" bias on the part of Justice Cardello that would have made it impossible for him to render fair judgment in the termination case, we hold that he was not required to disqualify himself merely because he was the presiding judge in the neglect case.

Citing Rule 2.11(A)(5)(c) of the Code of Judicial Conduct,[2] Sonia also argues that Justice Cardello was required to disqualify himself because he was a material witness concerning the matters that occurred in the neglect proceeding, including the efforts made under the direction of the circuit court to correct the conditions leading to the finding of neglect. See Sup. Ct. R. 38, Canon 2.11(A)(5)(c). We reject this argument as well. In Hale v. Wyatt, 78 N.H. 214, 215-16 (1916), we held that a judge may be a competent witness to prove all that occurred before him, but that he may not be compelled to testify. See Gelinas v. Metropolitan Prop. & Liability Ins. Co., 131 N.H. 154, 168-69 (1988). Even if we assume that Justice Cardello could have been a competent witness as to some issues of fact, Hale makes clear that he could not be compelled to testify, and his denial of the motion to disqualify carries with it the implicit assertion of his privilege not to testify, since he certainly could not preside over the termination case if he were to be a witness. Moreover, insofar as Sonia's argument is understood to suggest that she should be able to inquire into the reasons Justice Cardello did or did not take certain actions or his impressions about the adequacy of the services provided under the court's direction, "overwhelming authority concludes that a judge may not be compelled to testify concerning the mental processes used in formulating official judgments or the reasons that motivated him in the performance of his official duties." United States v. Roebuck, 271 F. Supp. 2d 712, 718 (D.V.I. 2003); see State ex rel Childs v. Hayward, 109 N.H. 228, 230 (1968) ("no magistrate should be subjected to interrogation with respect to his mental processes or the reasons for his decision").

Sonia makes no claim that any of the hearings in the neglect proceeding were conducted without a record. That being the case, we agree with DCYF

---

[2] Rule 2.11 of the Code of Judicial Conduct states, in relevant part:

(A) [A] judge shall disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to the following circumstances:
. . .
(5) The judge:
. . .
    (c) was a material witness concerning the matter.

12

that insofar as the circuit court's "direction" with respect to whether reasonable efforts were made to assist Sonia in correcting the conditions of neglect was at issue in the termination case, such direction could be fully established through the official records of the neglect proceeding and without any need for testimony from Justice Cardello.  See Childs, 109 N.H. at 230 ("nor should [a judicial officer] be subjected to interrogation with respect to the evidence presented before him when there is an existing record thereof").  For these reasons, Rule 2.11(A)(5)(c) did not require Justice Cardello to disqualify himself from presiding in this case.

IV

We next consider the parents' assertion that termination of their parental rights was unwarranted because DCYF did not make reasonable efforts to reunify them with their children.  In determining whether DCYF has made reasonable efforts to assist a parent in correcting the conditions that led to a finding of abuse or neglect, the court must consider whether it provided services that were "accessible, available and appropriate."  In re Michael E., 162 N.H. 520, 524 (2011); see RSA 169-C:24-a, III(c), IV (2014).  "The State's role is to provide assistance to parents to deal with and correct problems.  Its role is not to assume the full weight of the parents' responsibilities.  A parent must make [his] own effort in conjunction with the efforts made by DCYF."  Michael E., 162 N.H. at 525 (citations, quotations, and brackets omitted).

Addressing Larry's arguments first, we observe that the record shows that throughout the nearly two-year pendency of this matter before the circuit court's permanency hearing, DCYF provided Larry with ample services to assist him in correcting the conditions that led to the neglect finding.  That Larry made minimal efforts to avail himself of these services is a situation for which he, not DCYF, bears responsibility.

Larry advances two particularized arguments in support of his claim that DCYF made insufficient efforts to reunify him with his children.  First, he asserts that, after the children were placed in the legal custody of DCYF, the agency afforded him the opportunity for overnight visits on only three occasions, July 23, July 25, and July 29, 2012, and notes that "not one of those occasions occurred after the finding of neglect."  However, because the circuit court's finding of neglect was made in May 2011, more than a year before these three visits, it is apparent that this argument is again based on the premise that Larry was entitled to additional time after the superior court's adjudicatory order within which to correct the conditions of neglect.  We have already rejected this premise as applied to the circumstances of this case and, therefore, need not discuss it further.

Second, Larry contends that "[a]fter the parties separated, there were no further allegations of disputes between the parents, there were no concerns

13

with [Larry's] home (all reports were that it . . . was safe and sanitary), there were no reports of domestic violence, and the only supervision complaint was that the children watched television and played video games during their time with [Larry]." However, the record contains evidence showing that both before and after his separation from Sonia, Larry never consistently attended scheduled visits with the children, and he remained opposed to intervention by service providers. He also stopped attending team meetings after September 1, 2012, and he never completed the batterer's intervention program.

Turning to Sonia, she argues that DCYF failed to establish that it made reasonable efforts to assist her in correcting the conditions which led to the findings of neglect following the entry of such findings by the superior court. This argument is premised entirely upon the proposition that the circuit court erred in entering its permanency order, which relieved DCYF of any further responsibility to assist the parents in reuniting with the children, prior to the expiration of twelve months from the date of the superior court's adjudicatory order. Sonia does not argue that there was insufficient evidence of DCYF's reasonable efforts to assist the parents with reunification during the more than twelve-month period between the circuit court's adjudicatory order and the circuit court's permanency order. Thus, the argument is really nothing more than a repetition of the parents' contention that the twelve-month correction period begins to run anew when the superior court makes a finding of neglect after de novo review, a position we have already rejected for the reasons stated previously.

In sum, the record provides ample support for the trial court's finding that DCYF proved beyond a reasonable doubt that the requisites for termination of the parental rights of both Larry and Sonia under RSA 170-C:5, III were satisfied.

V

Larry next argues that the trial court erred in finding that termination of his parental rights was in the children's best interests. We disagree.

The determination of a child's best interests "requires assessment of which of the possible alternative dispositional orders is the most desirable, under a standard giving priority to the assumed interest of the child." Sophia-Marie H., 165 N.H. at 336; see In re Mathew G., 124 N.H. 414, 416 (1983).

Larry advances three points in support of his claim. First, he relies upon the trial court's finding that the children have a bond with their parents. Second, he notes that he and Sonia have a large extended family and that there was testimony that the children had a close relationship with some of these family members. Finally, he cites the concerns expressed by the GAL as to the parenting abilities of the foster parents.

14

We acknowledge that the above factors are pertinent to the best interests determination and arguably weigh against termination of Larry's parental rights. Cf. Sophia-Marie H., 165 N.H. at 338 (recognizing that lack of bond with parent is factor to be considered in termination decision); In re Lisa H., 134 N.H. 188, 193 (1991) (considering child's bond with foster parent when evaluating trial court's determination that termination of parental rights was in child's best interests). However, the trial court clearly was aware of these factors, but nonetheless concluded that they were substantially outweighed by evidence showing that Larry was unwilling or unable to take the steps necessary to become a responsible parent, that the children had established a long-term relationship with the foster parents, where they are safe and well-cared-for, and that, despite any reservations she had, the GAL recommended that termination was in the children's best interests. On this record, we cannot say that the trial court erred in concluding that termination of Larry's parental rights was in the best interests of A.M. and C.M. See Sophia-Marie H., 165 N.H. at 336.

VI

Finally, Larry contends that the court erred in terminating his parental rights based, in part, on the superior court's neglect finding entered in a proceeding in which he did not have counsel. He advances two specific arguments in support of his position. First, he argues that because counsel had been appointed to represent him in the circuit court neglect case, he attained a vested right to counsel which could not be taken away by what he claims was a retrospective application of the 2011 amendment to RSA 169-C:10, II(a) to his case. Second, he argues that the superior court erred in determining, after our remand in C.M., that the particular circumstances of his case were not such that fundamental fairness required that he be provided with appointed counsel. We conclude that neither of these issues is properly subject to review in this proceeding.

Larry did not raise his "vested right" argument before us in the C.M. appeal, and even if the interlocutory nature of our ruling would not present a res judicata bar to his presenting the issue to the superior court after our remand, but cf. State v. Presler, 731 A.2d 699, 702-04 (R.I. 1999), the record before us contains no indication that he ever did so. More importantly, with respect to both the vested rights issue and the claim that the particular circumstances of his case required the appointment of counsel, Larry did not appeal the superior court's dispositional order, which therefore became final and binding as to all issues raised and which could have been raised in that proceeding, including Larry's right to have court-appointed counsel in that case. See Gray v. Kelly, 161 N.H. 160, 164 (2010) ("Res judicata . . . bars the relitigation of any issue that was, or might have been, raised in respect to the subject matter of the prior litigation." (quotation omitted)); cf. Michael E., 162 N.H. at 523-24 (collateral estoppel barred parent in termination of rights case

15

from relitigating final order of neglect entered against her in RSA chapter 169-C case).

Affirmed.

HICKS and BASSETT, JJ., concurred; CONBOY, J., concurred specially.

CONBOY, J., concurring specially. Although I join the court's opinion in this case, I write separately regarding Larry's final arguments that he was entitled to court-appointed counsel during the abuse and neglect proceedings. We conclude that because Larry failed to appeal the superior court's dispositional order, he is precluded from raising those arguments in this termination of parental rights case. I acknowledge this court's decision in In re C.M., 163 N.H. 768 (2012) — that due process does not require the appointment of counsel for an indigent parent in every case involving allegations of abuse and neglect. In re C.M., 163 N.H. at 770, 777. However, for the reasons stated in my dissent in that case, I continue to believe that the New Hampshire Constitution requires the appointment of counsel in every such proceeding. Id. at 781-90 (Conboy, J., dissenting). Larry's failure to file a self-represented appeal from the superior court's final dispositional order is precisely why indigent parents should have legal representation in abuse and neglect proceedings without having to demonstrate particular circumstances warranting appointment of counsel: An unrepresented indigent parent could reasonably conclude that an abuse and neglect proceeding is simply part of a continuum of proceedings that end with termination of parental rights. See id. at 785 (Conboy, J., dissenting). Indeed, given that an initial petition alleging abuse and neglect often sets in motion a series of hearings that may ultimately result in termination of parental rights, it is doubtful that an unrepresented parent would appreciate that the two proceedings are separate cases and that issues from the abuse and neglect case cannot be deferred to an appeal from an order terminating his or her parental rights.

In light of the fact that the legislature reinstated the statutory right to counsel for indigent parents alleged to have abused or neglected their children only two years after having abolished the right, see Laws 2013, 144:60; Laws 2011, 224:77, it is unlikely that this situation will arise in another case. Unfortunately here, although Larry was represented by counsel during the termination of parental rights case, his counsel could not revive appealable issues from the abuse and neglect case, including the issues relating to the superior court's denial of his request for appointed counsel.

16