NOTICE:  This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports.  Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press.  Errors may be reported by e-mail at the following address: reporter@courts.state.nh.us.  Opinions are available on the Internet by 9:00 a.m. on the morning of their release.  The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

2nd Circuit Court-Lebanon Family Division
No. 2020-0436


IN RE R.H.


Argued: April 28, 2021
Opinion Issued: July 2, 2021


Office of the Attorney General, (Laura E. B. Lombardi, senior assistant attorney general, on the memorandum of law and orally), for the New Hampshire Division for Children, Youth and Families.


Barbara L. Parker, of Newport, by brief and orally, for Father.


BASSETT, J.  Father appeals an order of the Circuit Court (Mace, J.) terminating his parental rights over his minor child, R.H., on the ground that he failed to correct, within 12 months, the conditions that led to the circuit court's finding under RSA chapter 169-C that R.H. was neglected by R.H.'s mother (Mother), who had sole physical custody of the child.  See RSA 170-C:5, III (2014).  This appeal presents a narrow question: when does the 12-month period to correct the conditions of neglect or abuse under RSA 170-C:5, III begin to run against a non-accused, non-custodial parent?  On appeal, Father argues that the 12-month period does not begin until a non-accused, non-custodial parent is provided actual notice of the neglect or abuse finding.  The New Hampshire Division for Children, Youth and Families (DCYF) counters that the 12-month statutory period begins to run from the date of that finding, regardless of actual notice.  Because we agree with Father that the 12-month

period begins when a non-accused, non-custodial parent receives constitutionally-adequate notice of both the abuse or neglect finding and the possible impact on parental rights of a failure to correct the conditions leading to that finding, we vacate and remand.

The following facts are supported by the record or are not in dispute. On December 19, 2018, DCYF filed a petition in the circuit court alleging that Mother had neglected R.H. See RSA 169-C:7 (2014). The petition contained no allegations of neglect or abuse against Father, making him a non-accused parent. When the petition was filed, Mother had physical custody of R.H. Father's address and telephone number were "unknown," and, consequently, Father was not served with the neglect petition. On December 27, R.H. was removed from Mother's home and transitioned to an out-of-home placement with a relative.

On January 15, 2019, the circuit court held an adjudicatory hearing. See RSA 169-C:18 (Supp. 2020). Father did not receive notice of the hearing and was not present. Shortly thereafter, on January 23, the circuit court issued an adjudicatory order finding that Mother neglected R.H. by failing to maintain a safe and clean household and by exposing R.H. to the risk of physical abuse by Mother's significant other.

On February 21, the circuit court held a dispositional hearing. See RSA 169-C:19 (2014). Father was not present, and the court found that his "whereabouts [were] unknown." The parties dispute whether Father received notice of the hearing. Following the hearing, the court issued a final dispositional order, which found that Mother neglected R.H. and continued R.H.'s out-of-home placement, see RSA 169-C:21, I (2014). The court established reunification as the permanency plan for R.H. It set forth the conditions Mother had to meet to regain custody of R.H. and separate conditions for Father to meet to achieve reunification. Specifically, the court required that Father work cooperatively with DCYF and service providers, meet with DCYF to complete a social study and case plan, and sign necessary release forms. See RSA 169-C:21, II (2014). The court also listed services that DCYF should provide to Father, including case management and coordination services, individual counseling, child health support, transportation, and daycare. See id.

In May and August, the court held three-month and six-month review hearings. See RSA 169-C:24, I (2014). Father was not present at the three-month hearing, and the record is unclear as to whether Father was present at the six-month hearing. At both hearings, DCYF reported to the court regarding its efforts to contact Father, which included sending him letters, leaving voicemails, and checking with local law enforcement about his whereabouts. Following both hearings, the circuit court found Father not in compliance with

the dispositional order because he had not made adequate contact with DCYF, and, as a result, had not cooperated effectively with DCYF or completed a social study or case plan.

On November 26, the court held a nine-month review hearing at which Father was present. In its nine-month review order, the court again found Father out of compliance with the dispositional order. It noted that Father had not contacted DCYF until November 18, when he told DCYF that he had been visiting with R.H. and expressed an interest in spending more time with his child. The court also ordered DCYF to serve Father "with all orders in addition to the petitions" and inform Father "of his right to have a Bill F. hearing upon request." See In re Bill F., 145 N.H. 267, 274 (2000) (holding that due process provision of State Constitution requires that, in RSA chapter 169-C proceedings, parents who have not been charged with abuse or neglect shall be afforded, upon request, a full hearing regarding their ability to obtain custody); RSA 169-C:19-e, I (2014) (providing non-accused parent the right to request a full hearing regarding his or her ability to obtain custody). On December 31, DCYF mailed Father copies of the neglect petition and the court orders issued in the neglect proceeding.

On February 21, 2020, the circuit court held a permanency hearing, see RSA 169-C:24-b, I (2014), at which Father appeared. The court found Father not in compliance with the dispositional order because he had "not maintained consistent contact with [DCYF] throughout the past 12 months." The court observed that DCYF had "made ongoing efforts" to contact Father during the pendency of the proceedings. By contrast, the court highlighted Father's lack of contact with DCYF prior to the nine-month review hearing. It also noted Father's failure to fully engage with DCYF by completing a social study and his failure to request a Bill F. hearing. Because the court also found Mother out of compliance with the dispositional order, it modified the permanency plan for R.H. from reunification to adoption, directed DCYF to cease reunification efforts, and ordered DCYF to file termination of parental rights petitions against both parents. See RSA 169-C:24-a, I(a) (2014).

On March 2, DCYF filed a petition for termination of Father's parental rights based on his failure to correct the conditions leading to the neglect finding against Mother. See RSA 170-C:5, III. Under RSA 170-C:5, III, the circuit court may order termination when:

> The parents, subsequent to a finding of child neglect or abuse under RSA 169-C, have failed to correct the conditions leading to such a finding within 12 months of the finding despite reasonable efforts under the direction of the [circuit] court to rectify the conditions.

3

Id.; see RSA 490-D:2, IX (2010) (granting judicial branch family division jurisdiction to terminate parental rights); RSA 490-F:3 (Supp. 2020) (granting circuit court jurisdiction conferred upon former judicial branch family division and former district courts).

At the hearing on the petition, Father moved to dismiss and argued that DCYF had not proved that it had afforded him a full 12 months to correct the conditions leading to the neglect finding. He asserted that the 12-month period did not begin to run until he received notice of the neglect proceedings and his associated rights. On August 6, the circuit court issued a final order terminating both parents' rights over R.H. It concluded that DCYF had "carried its burdens of proof" and that termination was in the best interest of R.H. The court did not specifically address Father's notice argument. Father filed an unsuccessful motion to reconsider, and this appeal followed. Mother is not a party to this appeal.

On appeal, Father argues that the circuit court erred when it terminated his parental rights under RSA 170-C:5, III despite the fact that he did not have a full 12 months to correct the conditions of neglect. His argument is premised upon his contention that the 12-month period does not begin to run with respect to a non-accused, non-custodial parent, like himself, until that parent has received actual notice of the abuse or neglect finding regarding his or her child. DCYF counters that the plain language of RSA 170-C:5, III does not require "that a parent have actual knowledge of the neglect proceeding throughout the entire twelve-month statutory period," and asserts that the 12-month period starts on the date of the circuit court's adjudicatory finding of neglect. Accordingly, we must determine when the 12-month period under RSA 170-C:5, III begins to run with respect to a non-accused, non-custodial parent.[1]

Resolving this issue requires that we engage in statutory interpretation. We review the trial court's statutory interpretation de novo. See In re C.M., 166 N.H. 764, 773-74 (2014). We are the final arbiter of the intent of the legislature as expressed in the words of the statute considered as a whole. Id. at 774. We first look to the language of the statute itself, and, if possible, construe that language according to its plain and ordinary meaning. Id. We interpret legislative intent from the statute as written and will not consider what the legislature might have said or add language that the legislature did not see fit to include. Id. We construe all parts of a statute together to effectuate its overall purpose and avoid an absurd or unjust result. Id. Moreover, we do not consider words and phrases in isolation, but rather within

---

[1] Although DCYF appeared to assert at oral argument that Father is precluded from raising his notice argument because he failed to raise it during the RSA chapter 169-C proceeding, DCYF did not brief that argument and we therefore decline to address it. See In the Matter of Gendron & Plaistek, 157 N.H. 314, 319-20 (2008).

the context of the statute as a whole.  Id.  This approach enables us to better discern the legislature's intent and to interpret the statutory language in light of the policy or purpose sought to be advanced by the statutory scheme.  Id.

RSA chapter 170-C sets forth the statutory framework governing termination of parental rights.  We have long recognized that the "right to raise and care for one's children [is] a fundamental liberty interest" protected by the State Constitution.  Petition of Kerry D., 144 N.H. 146, 149 (1999).  The purpose of RSA chapter 170-C is to establish a judicial process for involuntary termination of those fundamental parental rights that "will safeguard the rights and interests of all parties concerned and when it is in the best interest of the child."  RSA 170-C:1 (2014).  Essential to this statutory scheme is "the philosophy that whenever possible family life should be strengthened and preserved."  Id.  Therefore, before a court may order the termination of parental rights, the petitioning party must prove a statutory ground for termination beyond a reasonable doubt.  See C.M., 166 N.H. at 773.  Once a statutory ground is established, the court must then consider whether termination is in the child's best interest.  Id.  Here, the legal issue presented relates only to the statutory ground asserted to support termination of Father's parental rights.

RSA 170-C:5 sets forth the statutory grounds for termination of a parent-child relationship.  The statutory ground at issue here, RSA 170-C:5, III, permits the court to terminate parental rights when a parent has failed to correct the conditions leading to a neglect or abuse finding within 12 months of that finding despite reasonable efforts under the direction of the court to rectify the conditions.  We have previously held that, to have parental rights terminated under this subsection, a parent need not have been named as the respondent — the accused party — in the underlying RSA chapter 169-C abuse or neglect petition.  In re O.D., 171 N.H. 437, 441-42 (2018).

Notably, we have also held that RSA 170-C:5, III requires the circuit court to review a parent's conduct over a period of at least 12 months before determining whether the parent failed to correct the conditions of neglect or abuse.  In re Juvenile 2007-084, 156 N.H. 186, 188-90 (2007) (reversing termination of parental rights under RSA 170-C:5, III because circuit court considered father's efforts to rectify conditions of neglect over a period of less than 12 months).  However, we have never had occasion to address the specific question presented in this appeal: given that, under RSA 170-C:5, III, a parent must have at least 12 months in which to correct the conditions of abuse or neglect, when does the 12-month period begin for a non-accused, non-custodial parent?[2]

---

[2] We have not had occasion to address this issue in cases involving non-accused parents because, in each of those cases, the non-accused parents involved had knowledge of, or participated in, the abuse or neglect proceedings from their inception, and the adequacy of notice was not an issue on appeal.  See In re O.D., 171 N.H. at 443 (noting that both parents were present at dispositional

5

DCYF, citing C.M., argues that the 12-month period "runs from the date of the circuit court's adjudicatory order" and that this rule applies regardless of whether and when a non-accused, non-custodial parent receives notice of the RSA chapter 169-C abuse or neglect finding. (Quotation omitted.) We disagree.

In C.M., we addressed whether the 12-month period started anew after the superior court made de novo findings of neglect in the parents' appeal from the circuit court's findings under a prior version of RSA 169-C:28. See C.M., 166 N.H. at 767, 774-75; RSA 169-C:28 (2014) (amended 2020). We held that, provided the superior court and circuit court dispositional orders are not "significantly different," the 12-month period does not start anew; rather, it "runs from the date of the circuit court's adjudicatory order." C.M., 166 N.H. at 775. Because the appellants in C.M. were accused parents and the sole question before us was whether the 12-month period started anew as a result of the superior court's dispositional order, id. at 774-75, we had no occasion to decide when the 12-month period begins to run for a non-accused, non-custodial parent. Because we do not agree with DCYF that C.M. controls, we turn to the language of RSA 170-C:5, III.

The statute provides, in relevant part, that the court may terminate a parent-child relationship if the parent has "failed to correct the conditions leading to [a finding of child neglect or abuse under RSA chapter 169-C] within 12 months of the finding." RSA 170-C:5, III. Father argues that we have already interpreted the statute as providing a parent with at least 12 months to correct the conditions of abuse or neglect, and that a parent cannot practically receive the benefit of those 12 months without first receiving actual notice of the finding and the obligation to correct. DCYF counters that "[n]othing in the plain language of the statute requires that a parent have actual knowledge of the neglect proceeding throughout the entire twelve-month statutory period." We agree with Father that the 12-month period begins for a non-accused, non-custodial parent only after that parent is provided constitutionally-adequate notice of both the neglect or abuse finding and the possible impact on parental rights of a failure to correct the conditions leading to that finding.

In Juvenile 2007-084, we held that, under RSA 170-C:5, III, a parent has a minimum of 12 months to correct the conditions leading to an abuse or neglect finding before termination of his or her parental rights. Juvenile 2007-084, 156 N.H. at 188-89. We reasoned that, because the statutory language "requires that the conditions be corrected within twelve months, it cannot be determined whether the conditions have been corrected until twelve months

---

hearing); In re Juvenile 2006-674, 156 N.H. 1, 2, 6 (2007) (noting that non-accused father, who appeared at the adjudicatory hearing, had been "a knowing participant in the abuse and neglect proceedings from the beginning"); In re Tricia H., 126 N.H. 418, 420 (1985) (observing that non-accused father had "actual notice" of the neglect petition against mother).

have elapsed." Id. We concluded that, "before a petition to terminate may be granted [under RSA 170-C:5, III], the [trial] court must determine whether the parents have failed, over the span of twelve months, to correct the conditions leading to the finding of abuse or neglect." Id. at 189. As a result, we held that the trial court erred when it terminated father's parental rights after considering his conduct over a period of only 11 months. Id.

Implicit in our analysis in Juvenile 2007-084 is the fundamental proposition that a parent whose rights are in jeopardy under RSA 170-C:5, III must have notice before the 12-month period begins. See id. at 187, 188-89 (involving accused parent who had stipulated to neglect finding). In other words, in order for the 12-month period set forth in RSA 170-C:5, III to provide a parent with a meaningful opportunity to correct the conditions of neglect or abuse, before the 12-month period begins to run, that parent must be aware of the abuse or neglect finding and the consequences to her or his parental rights of a failure to correct — including the possibility of termination of those rights. This is so because, if a parent is unaware of the abuse or neglect finding and the impact on parental rights of a failure to correct, then, in reality, the parent does not have the required 12 months to correct the conditions of abuse or neglect.

This construction of RSA 170-C:5, III advances the purposes of RSA chapter 170-C. Although DCYF is correct that the welfare of the child is the dominant consideration in RSA chapter 170-C termination proceedings and will prevail over the fundamental rights of the parent if termination of the parent-child relationship is in the child's best interest, see In re Adam R., 159 N.H. 788, 792 (2010), the other stated purposes of RSA chapter 170-C include "safeguard[ing] the rights and interests of all parties concerned," and "strengthen[ing] and preserv[ing]" family life "whenever possible," RSA 170-C:1 (emphasis added). Our interpretation of RSA 170-C:5, III furthers the purpose of protecting the rights and interests of all parties because it safeguards the due process rights of non-accused, non-custodial parents. See id.; see also Adam R., 159 N.H. at 792 (stating that "terminations of parental rights will be upheld if applicable due process requirements have been met" (emphasis added)). A central tenet of the due process guarantees of our State Constitution is the receipt of adequate notice prior to the deprivation of a fundamental right or liberty interest. See, e.g., Petition of Bagley, 128 N.H. 275, 280, 282, 285, 287 (1986) (holding, in the context of the Child Protection Act's Reporting Law, that parents' due process rights had been violated because they had not received adequate notice that the State had recorded a "founded" neglect allegation against them in the central registry); Ladd v. Coleman, 128 N.H. 543, 544, 546-47 (1986) (construing statute consistent with due process to require that period for filing an appeal of a landlord-tenant action "begins to run when the litigant is actually or constructively notified of the court's decision"). Our construction of the statute also promotes the other stated purpose of the statutory scheme: to protect the interests of all parties —

including the interests of the child — in preserving "family life," RSA 170-C:1, by ensuring that a parent has at least 12 months to correct the conditions of neglect or abuse before severance of the parent-child relationship.

We are not persuaded by DCYF's arguments in opposition to our construction of the statute. First, DCYF contends that our interpretation of RSA 170-C:5, III "could result in a delay in permanency for a child based on a parent's voluntary absence from their child's life." We disagree. With respect to parents who are voluntarily absent from their children's lives, DCYF has the option of petitioning to terminate parental rights on the ground of abandonment. See RSA 170-C:5, I (2014) (providing circumstances under which court may find parent has abandoned child, including when "the evidence indicates that such parent has made only minimal efforts to support or communicate with the child"); In re H.J., 171 N.H. 605, 609 (2018) (describing rebuttable presumption of abandonment triggered by parent's failure to support or contact child for period of six months).

Nor are we persuaded by DCYF's argument that, under the interpretation of the statute that we adopt today, a parent's "active avoidance of DCYF" would enable a parent to endlessly prolong the proceedings and rob the child of permanency. We note that the circuit court did not find that Father engaged in intentional avoidance. Moreover, DCYF's argument necessarily implicates the question as to what type of notice is sufficient to start the 12-month clock — an issue that we address below.

Finally, DCYF argues that, even if notice is required to begin the 12-month period under RSA 170-C:5, III, we should affirm the circuit court's ruling because the record demonstrates that Father had 12 months' notice. We disagree. "This court may decide factual issues not reached by the trial court only if the record reveals that a reasonable fact finder necessarily would reach a certain conclusion enabling us to decide the issue as a matter of law." Trachy v. LaFramboise, 146 N.H. 178, 182 (2001) (quotation omitted). Here, the trial court did not make an express finding on this issue, and the record on appeal is insufficient for us to decide, as a matter of law, that Father had 12 months' notice. Nor can we assume, as DCYF urges, that the trial court made all findings necessary to support its ruling under the new standard we articulate today and affirm on that basis. See In the Matter of Aube & Aube, 158 N.H. 459, 466 (2009). The circuit court did not have the benefit of our new construction of RSA 170-C:5, III. Accordingly, our usual practice of assuming that the trial court made all subsidiary findings necessary to support its general ruling does not apply. Cf. Boulders at Strafford v. Town of Strafford, 153 N.H. 633, 642 (2006) (remanding to trial court for proceedings consistent with newly-articulated standard).

Given the foregoing considerations, including the fundamental parental right at stake, see Kerry D., 144 N.H. at 149, we hold that, before terminating a

non-accused, non-custodial parent's rights under RSA 170-C:5, III, a circuit court must find that DCYF carried its burden of proving beyond a reasonable doubt that: (1) the parent was provided a minimum of 12 months' notice of the abuse or neglect finding and was informed about the impact on parental rights of a failure to correct the conditions of abuse or neglect, including the possibility of termination; and (2) the parent failed to correct the conditions of abuse or neglect during the 12-month time period. In making the finding as to the adequacy of notice, the circuit court must determine whether and when the non-accused, non-custodial parent was provided constitutionally-adequate notice of both the abuse or neglect finding and the effect on parental rights of a failure to correct the conditions leading to that finding. See Petition of Bagley, 128 N.H. at 286-87 (explaining that due process requires notice that is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections," gives a reasonably complete statement of the basis of the action, and specifically identifies the individuals affected by the action).

We need not decide today exactly how notice must be given to be constitutionally adequate — for example, by in-person service from a sheriff or other law enforcement officer, by certified mail, or by publication. Cf. RSA 170-C:7 (2014) (requiring that parent whose parental rights may be terminated receive notice of termination petition "by personal service" and when that would "appear impractical," by certified mail to last known address or by publication as outlined in the statute). Accordingly, we leave for another day the question of whether, when there is evidence of a parent's intentional evasion of service, some means of notice other than personal service — such as publication — is sufficient to start the 12-month clock. Nor do we decide the specific information that the notice must contain in order to satisfy due process requirements. Cf. RSA 169-C:8, I, IV (2014) (requiring that the summons issued to "all persons named" in the neglect petition explain the proceedings and state the rights of the person summoned under RSA chapters 169-C and 170-C); Model Court Project in Cooperation with the New Hampshire Court Improvement Project, Supplement to Protocols Relative to Abuse and Neglect Cases and Permanency Planning (Revised April 2003), Chapter 1B (Missing Parent in a RSA 169-C Case), Protocol 7 (effective July 1, 2020), https://www.courts.state.nh.us/fdpp/2020-Protocols-Missing-Parent.pdf (requiring court to issue summons to missing parent once located to be served consistent with RSA 169-C:8).[3]

---

[3] Although we are not bound by the Protocols regarding "missing parents" in RSA chapter 169-C proceedings, we note that they address many of the due process and notice issues implicated in this case. See Model Court Project in Cooperation with the New Hampshire Court Improvement Project, supra at Chapter 1B, Introduction and Acknowledgements, Protocols 1-10.

Having articulated this new standard, we vacate the circuit court's order and remand for further proceedings consistent with this opinion.  See <u>Boulders at Strafford</u>, 153 N.H. at 642.

<u>Vacated and remanded</u>.

HICKS, HANTZ MARCONI, and DONOVAN, JJ., concurred.