NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

2nd Circuit Court - Haverhill Family Division
No. 2014-642

IN RE K.H.

Argued: May 21, 2015
Opinion Issued: June 19, 2015

Joseph A. Foster, attorney general (Laura E.B. Lombardi, senior assistant attorney general, on the memorandum of law and orally), for the petitioner.

James R. Laffan, of Lebanon, by brief and orally, for the respondent.

DALIANIS, C.J. The respondent, D.H., appeals an order of the Circuit Court (Cyr, J.) granting the petition of the petitioner, the New Hampshire Division for Children, Youth and Families (DCYF), to terminate his parental rights over his son, K.H., on the ground that he failed to correct, within 12 months, the conditions leading to a finding of neglect. See RSA 170-C:5, III (2014). On appeal, the respondent argues that: (1) the trial court admitted hearsay evidence in violation of RSA 170-C:10 (2014); and (2) there was insufficient evidence to support the court's finding that he failed to correct the conditions leading to the original neglect finding and its determination that terminating his parental rights was in the child's best interests. We affirm.

I. Background

The trial court found, or the record contains, the following facts. The child was born in February 2008. On September 17, 2009, a petition for

abuse/neglect was brought against the respondent and the child's mother. At that time, the respondent was incarcerated in a county jail in connection with an incident in which he had punched the child's mother in the stomach in the child's presence. The petition was based upon domestic violence between the parents, the failure of the parents to maintain a safe, clean, and sanitary home for their child, and their failure to address their respective mental health issues. The affidavit in support of the petition alleged, among other things, that DCYF was "concerned with the decisions that the parents are making regarding their son" because it was "apparent that there are anger issues, domestic violence, and parenting issues," including issues related to "the home environment, supervision of [the child] and [the respondent] being incarcerated for assault."

Thereafter, the parents consented to a finding of neglect. The trial court approved their consent decree on September 23, 2009. Pursuant to the decree, the child was placed with his mother, the respondent was granted supervised visitation with him, and DCYF was awarded legal custody of him.

The child remained in his mother's physical custody until March 2010, when the court awarded DCYF protective supervision of the child because the mother had failed to supervise him properly and had placed him at risk of harm. The trial court placed the child with his current foster family, where he remained until June 22, 2011, when he was placed with the respondent.

Between June 22, 2011, and September 13, 2012, the original neglect case remained open, and DCYF continued to provide services. However, in approximately early September 2012, assessment workers and the guardian ad litem visited the respondent's home to investigate a report that he had physically abused and emotionally neglected the child (a report that was never confirmed). They found the child's behavior to be out of control, observing him choking and hitting the respondent. The respondent had to be prompted to tell the child to stop. The respondent told an assessment worker that he did not discipline the child when the child acted out. The child told the worker that he hits the respondent because the respondent does not listen to him.

During the week after this initial visit, the child again acted out aggressively. At one point, he struck the respondent in the groin with a bar, causing bleeding. On another occasion, the respondent called the police twice in one evening because the child was hitting and throwing things. On still another occasion, the police were called because the child was in a car, throwing things. The police were able to get the child out of the car, and they took him to the emergency room. Later, the respondent told police officers that he could no longer have the child in his home.

The next weekend, DCYF approved placing the child with his current foster family for respite care. The respondent and his girlfriend, who is not the

child's mother, reported that, after the child returned from his foster family's home, he was like a different child. However, within days of the child's return to the respondent's home, a parenting support worker, who was at the respondent's home at the time providing services, called DCYF because the respondent again said that he could not "do this anymore," meaning that he could no longer take care of his son. The child was again taken to his foster family for respite care.

On September 13, 2012, DCYF filed an ex parte motion to change the child's placement from his father's care to that of a licensed foster parent. In its motion, DCYF stated that it sought a change in placement for the child because "[t]here is reasonable cause to believe that [the child] is in a potentially unsafe environment with his father who is unable to maintain [the child's] behaviors in the home." The trial court granted the motion, and the child was placed, again, with his current foster family. Upon his return to the foster family, the child's aggressive behaviors lessened.

DCYF prepared, and the respondent signed, an initial case plan, which stated that among the tasks for him to accomplish were "[m]aintaining structure and a predictable schedule," and "[s]upervision and discipline" of the child, who was now a preschooler. The plan stated that the respondent was "often challenged to regulate his emotions" and that he did "not understand the effects that a lack of consistency can have on his son."

To address these concerns, the plan provided that the respondent would continue in counseling with his then counselor and that he would participate in family therapy with his girlfriend and the child. Moreover, under the plan, DCYF provided a parent aide to supervise visits between the respondent and the child and provide the respondent with information about child development and parenting skills. Pursuant to the plan, the child was evaluated by medical professionals, who concluded that his aggressive behavior was not related to any organic cause, but appeared to be the result of his living environment.

At a review hearing in November 2012, DCYF reported to the court that the child had "adjusted well to his return to foster care." DCYF described the child as "generally happy and . . . presently well[-]behaved."

The joint counseling sessions went well for a period of time; however, from mid-April through August 2013, it appears that the respondent either cancelled or did not appear for the sessions. In August 2013, the mental health agency that had been providing the counseling closed the respondent's case for non-attendance. Similarly, DCYF reported in its July 2013 review that the respondent had "missed sessions of individual therapy."

The use of a parent aide for supervised visits and to help the respondent acquire better parenting skills followed a similar path. The parent aide testified

3

that the respondent often did not stay focused upon parenting the child during the visits and had to be prompted to discipline the child when necessary. The respondent appeared more focused upon matters such as his employment instead of upon learning about child development and gaining parenting skills.

After the respondent obtained employment requiring him to work outside of the local area, the supervised visits between the respondent and the child became less frequent. For some visits, the respondent's girlfriend appeared in his place. Other visits were cancelled. Cancelled visits upset the child.

In September 2013, DCYF reported to the court that the respondent's "participation in services designed to support reunification have diminished or completely lapsed." Accordingly, DCYF sought permission to file a petition to terminate the respondent's parental rights.

Following a permanency hearing in April 2014, the trial court ordered DCYF to file a petition to terminate the respondent's parental rights based upon the court's findings that: (1) the respondent had been inconsistent with regard to having visitation with the child; (2) the respondent did not apprise DCYF of significant changes in his employment and housing in a timely manner; (3) the respondent had failed to participate meaningfully in therapy and counseling with his son; (4) the respondent had not participated meaningfully in parent education services; (5) the respondent had not consistently attended individual therapy sessions; and (6) the respondent remained "unable to provide proper parental care and protection" for his son, despite numerous services provided to him.

Following a hearing on the merits of the petition to terminate the respondent's parental rights, the court found that DCYF had sustained its burden of proof, beyond a reasonable doubt, that the respondent had failed to correct the conditions that led to a finding of neglect, despite the numerous services provided to him, and that termination of his parental rights was in the child's best interests. Accordingly, the trial court granted the petition, and this appeal followed.

II. Analytical Framework

Before the trial court may terminate a parent's rights, DCYF must prove a statutory ground for terminating the parent's rights beyond a reasonable doubt. In re Juvenile 2006-674, 156 N.H. 1, 4 (2007). One such ground is the parent's failure, "subsequent to a finding of child neglect . . . under RSA 169-C, . . . to correct the conditions leading to [the neglect] finding within 12 months of the finding despite reasonable efforts under the direction of the [circuit court] to rectify the conditions." RSA 170-C:5, III; see RSA 490-D:2, IX (2010) (granting family division of the circuit court jurisdiction to terminate parental rights).

4

If the circuit court finds a statutory ground for terminating a parent's rights, it must then consider whether terminating the parent's rights is in the child's best interests. In re Zachary G., 159 N.H. 146, 157 (2009). Such a determination requires assessing which of the possible alternative dispositional orders is the most desirable, under a standard that gives priority to the child's assumed interest. See In re Shannon M., 146 N.H. 22, 28 (2001). We will affirm the trial court's order unless it is unsupported by the evidence or erroneous as a matter of law. In re Haley K., 163 N.H. 247, 249 (2012).

III. Appeal Issues

A. Hearsay Evidence

Citing RSA 170-C:10, the respondent first argues that the trial court erred when it admitted into evidence reports that contained hearsay statements. The admissibility of evidence is committed to the sound discretion of the trial court. In re Noah W., 148 N.H. 632, 637 (2002). We will not disturb the trial court's decision absent an unsustainable exercise of discretion. Id.

We have held that "[e]vidence forming the basis for termination of parental rights shall be admitted when it complies with the statutory safeguards of RSA 170-C:10." Id. at 638. RSA 170-C:10 provides, in pertinent part, that "relevant and material information of any nature, including that contained in reports, studies or examinations, may be admitted and relied upon to the extent of its probative value." RSA 170-C:10 also provides that "[w]hen information contained in a report . . . is admitted in evidence, the person making such a report . . . shall be subject to both direct and cross-examination if he or she is residing or working within the state, or if he or she is otherwise reasonably available."

Here, the respondent concedes that "the reports submitted in evidence were generally offered while the purported author was on the stand and therefore subject to cross examination." The respondent argues, however, that the trial court erred by admitting the reports because they contain the hearsay statements of the child's current foster mother, whom neither the respondent nor DCYF called as a witness.

RSA 170-C:10 requires only that "the person making [the] . . . report" testify at trial, unless he or she is unavailable. It does not require testimony from the individuals who provided the information that is contained in the report. RSA 170-C:10 distinguishes between the report itself and the "relevant and material information" that it contains. Accordingly, the fact that the reports in this case arguably contained the hearsay statements of the foster mother does not render them inadmissible under RSA 170-C:10. Indeed, we have held that a trial court does not err by admitting relevant and material evidence under RSA 170-C:10 even if the same evidence would have been

5

inadmissible under the New Hampshire Rules of Evidence. Noah W., 148 N.H. at 636. Thus, this fact fails to establish that the trial court unsustainably exercised its discretion when it admitted the challenged reports into evidence.

B. Sufficiency of the Evidence

The respondent next asserts that the evidence was insufficient to support the trial court's finding that he failed to correct the conditions that led to a finding of neglect. Here, the conditions leading to the neglect finding included the respondent's failure to maintain a safe home for the child and his failure to address his own mental health issues. To correct those conditions, the respondent was ordered to, among other things: (1) have visits with the child supervised by a parent aide, who would provide the respondent with information about child development and techniques; (2) "meaningfully participate in individual counseling to learn to regulate his emotions"; and (3) participate in joint counseling with his girlfriend "to address parenting issues."

The trial court found, however, that the respondent either cancelled or did not attend visits with his son. The court also found that the respondent ceased attending family therapy sessions and that the mental health agency that had provided this therapy closed the case for non-attendance. The court also credited the testimony of a parent aide that the respondent failed to stay focused upon parenting the child during his supervised visitation and failed to take advantage of those visits to learn about child development and parenting skills. The record supports these findings. Based upon the respondent's failure to comply with the above orders, the trial court determined that he had failed to correct the conditions that led to a finding of neglect. See In re Juvenile 2003-195, 150 N.H. 644, 648-49 (2004) (upholding determination that father failed to correct conditions leading to neglect finding when he did not comply with consent decree in abuse/neglect case); In re Craig T., 147 N.H. 739, 745-48 (2002) (upholding trial court's finding that mother failed to correct the conditions leading to the neglect and abuse findings when she failed to comply with the court's dispositional orders).

The respondent does not challenge the evidentiary support for these findings. Instead, he asserts, based upon selective quotes from the hearing transcript, that: (1) his son enjoyed spending time with him; (2) he parented his son effectively when his son acted out aggressively; (3) his son acted aggressively while living with his foster family; (4) he should have been credited with his girlfriend's actions in managing the child's behavior; (5) the child's behavior might have had a neurological basis; and (6) because DCYF did not authorize neurological testing of the child, and given that the child acted out while in foster care, "it is mere conjecture to assert . . . that [the respondent's] style of parenting . . . is so inimical to [the child's] welfare as to require the termination of [the respondent's] rights as his father."

6

The respondent misperceives our role on appeal. Our task on appeal is not to determine whether we would have found differently than did the trial court, but to determine "whether a reasonable person could have found as the trial judge did." In re Juvenile 2005-426, 154 N.H. 336, 339 (2006). Here, given that the record supports the trial court's findings, which it found beyond a reasonable doubt, we cannot conclude that its determination that the respondent failed to correct the conditions leading to the neglect finding was either unsupported by the evidence or plainly erroneous as a matter of law. Zachary G., 159 N.H. at 153.

The respondent next contends that the trial court erred by concluding that terminating his parental rights was in the child's best interests. The trial court found that it was in the child's best interests to terminate the respondent's parental rights because the child "has been in the same foster home for most of his short life," looks to his foster parents to meet his needs, and sees them as his "[M]ommy . . . and Daddy." The trial court also found that the foster mother has indicated that she is willing to adopt the child. The trial court further found, and the respondent does not dispute, that the child "has responded well to [the foster family's] consistency and directions." Moreover, the guardian ad litem observed that the child "has done extremely well in his foster provider's home," and opined that the best interests of the child "dictate that [he] live with [the foster family]." There was also testimony that adoption was in the child's best interests because of "the changes and improvements in his behavior" since his foster home placement, "the consistency he enjoys there, and the fact that he's been there as long as he has." Upon this record, the trial court's finding that terminating the respondent's parental rights was in the child's best interests was neither unsupported by the evidence nor plainly erroneous as a matter of law.

This is not a case, as argued by the respondent, where he has been deprived of his right to parent his child "simply because 'better parents' have been found." Adam R., 159 N.H. at 801. Instead, we believe that the circuit court's decision properly recognized that keeping the child in a stable and permanent environment was consistent with his best interests. See id.

All issues raised in the notice of appeal, but not briefed, are deemed waived. See In re Estate of King, 149 N.H. 226, 230 (2003).

Affirmed.

HICKS, CONBOY, LYNN, and BASSETT, JJ., concurred.

7