NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by e-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

9th Circuit Court-Nashua Family Division
No. 2020-0467

IN RE M.M.

Submitted: March 25, 2021
Opinion Issued: June 2, 2021

Gordon J. MacDonald, attorney general (Laura E. B. Lombardi, senior assistant attorney general, on the memorandum of law), for the petitioner.

Amy B. Davidson, of Contoocook, on the brief, for the respondent.

HANTZ MARCONI, J. The respondent, the father of the juvenile (Father), challenges the superior court's refusal of his appeal from a final dispositional order of the Circuit Court (Chabot, J.) on a neglect petition brought by the petitioner, the New Hampshire Division for Children, Youth and Families (DCYF). Father argues that the amendment to RSA 169-C:28, effective July 1, 2020, eliminating the right to appeal final dispositional orders in abuse and neglect proceedings to the superior court for de novo review, does not apply to his case. See Laws 2020, 37:125 (amending RSA 169-C:28 (2014)). Father also appeals the circuit court's final dispositional order directly to this court pursuant to the amended statute, see id., arguing that the circuit court should not have considered and issued orders on DCYF's neglect petition and, alternatively, that there was insufficient evidence to support a finding of neglect, see RSA 169-C:3, XIX(b) (Supp. 2020).

We conclude that the July 2020 amendment to RSA 169-C:28 applies to Father's case, barring his appeal to the superior court for de novo review. Conducting our direct review of Father's appeal from the circuit court's final dispositional order, we conclude that the circuit court did not err in considering and issuing orders on DCYF's neglect petition. We also affirm the circuit court's finding of neglect against Father.

I

The following relevant facts and procedural history either were found by the circuit court or appear in the record before us. See In re Juvenile 2005-212, 154 N.H. 763, 764 (2007). Father and Mother are M.M.'s biological parents. M.M.'s parents are divorced, and he has half-siblings who live in his parents' respective homes. M.M. has a history of trauma and mental health conditions, and has exhibited aggressive behaviors toward himself and others in the past. In 2015, M.M. went to live with Mother after an incident between M.M. and Father's wife. As a result of this incident, a 2015 parenting plan provision bars Father's wife from having unsupervised contact with M.M. For the next approximately two-and-a-half years, M.M. primarily lived with Mother and her other children, and Father had minimal contact with M.M. Over roughly this same period, M.M. was admitted to New Hampshire Hospital (NHH) eight times as a result of involuntary emergency admissions (IEA).

In January 2018, Mother filed a petition alleging that M.M. was a child in need of services (CHINS). See RSA 169-D:2, II(d) (2014). Following a CHINS adjudicatory hearing, M.M. was placed at Nashua Children's Home (NCH), a residential facility, where he remained for nearly two years, until January 2020. See RSA 169-D:14 (2014). M.M.'s CHINS case remained open throughout this period, through which M.M. and his parents received services with the goal of returning M.M. home to live with either Mother or Father. Father was not officially joined as a party to the CHINS case until October 2018; however, he was tangentially involved as early as April 2018 — having been approved for off-grounds visitation with M.M., expected to participate in family therapy at NCH, attending hearings, and providing input for M.M.'s pre-dispositional investigation. See RSA 169-D:14, III.

M.M.'s CHINS case was scheduled to close on April 17, 2020. In preparation for the closure of M.M.'s CHINS case, it was planned for him to transition out of NCH in January of 2020 so that he and his parents would have the benefit of CHINS services for the first few months after M.M. returned home. With that goal in mind, there was increased urgency during the fall of 2019 to ensure that Mother and Father had plans in place to facilitate M.M.'s return to their care, including scheduling after-school activities for M.M. and securing support from other people to help Mother and Father to look after and care for M.M. DCYF and M.M.'s Juvenile Justice probation officer made referrals to multiple services to prepare Father and Mother for M.M.'s exit from

his CHINS plan; however, the parents failed to follow through or delayed acting on the majority of the recommendations. For example, Father did not have M.M. to his home for overnight visits until November 2019 and did not consistently participate in court-ordered family therapy until December 2019. Additionally, DCYF and Juvenile Justice stressed the importance of securing additional family support for M.M. in the event Father and/or Mother needed assistance, and also stressed the need to amend the parenting plan to permit Father's wife to have unsupervised contact with M.M. to assist with M.M.'s care.

On January 7, 2020, M.M. was conditionally discharged from NCH and placed with Mother as part of the transition out of his CHINS case. M.M. spent time with Father at Father's home, including overnight visits, in January and early February as part of his conditional release. After a visit with Father on February 8, M.M. told Mother that Father had hit him, prompting Mother to call the police. The responding officer determined that no crime occurred and that Father had not abused or neglected M.M.; however, pursuant to the police department's standard procedure, the officer implemented a verbal "safety plan" whereby M.M. would stay with Mother until the officer notified DCYF about the incident.

Following an incident of aggression toward Mother and her other children on February 18, M.M. was admitted to St. Joseph's Hospital pending the opening of an available bed at NHH for an involuntary emergency admission. Consequently, an emergency CHINS hearing was held on February 25. In its order, the Circuit Court (Leary, J.) stated that since its last hearing on January 7, M.M. "ha[d] been IEA'd and [is] awaiting a bed at NHH" and indicated that M.M. was to be released to Mother upon his eventual discharge from the hospital. At the hearing, the court said that the parties could seek emergency orders if needed, and scheduled a review hearing for March 31, 2020. Though M.M. was expected to be transferred to NHH, on February 26, the day after the CHINS hearing, St. Joseph's Hospital notified DCYF that M.M. had stabilized and no longer met the criteria for admission to NHH and, consequently, that it was preparing to discharge M.M.

On February 27, Mother was informed that M.M. was ready to be discharged. She declined to take custody of M.M. due to her concerns that bringing M.M. home posed a risk to her safety and the safety of her other children, and she could not suggest anyone else to care for M.M. At approximately 9:00 a.m., DCYF called Father, informing him that M.M. was ready to be discharged, that Mother had already refused to take custody of M.M., and that Father needed to pick him up. Father responded that there were several barriers preventing him from picking up M.M., among them that he was going to be working in Vermont for the next week and could not take M.M. with him. DCYF asked if he had any relatives or other plans for M.M., and Father said he would get back to DCYF. After not hearing back from

3

Father, DCYF reached out again, and a conference call was held later that day with Father, DCYF, and Juvenile Justice, which had been working with M.M., Father, and Mother through M.M.'s CHINS case.

DCYF reiterated that Father needed to pick M.M. up from St. Joseph's Hospital because M.M. was ready for release. Father said that the police officer's "safety plan" and the CHINS placement with Mother precluded him from taking custody of M.M. Father was told that he needed to pick M.M. up in the next two hours or DCYF would file a neglect petition against him. Father's wife was still not permitted to have unsupervised contact with M.M., so Father said that the only way he could take custody of M.M. would be to bring M.M. with him to work in Vermont, which would leave M.M. unsupervised while Father was working. Father could not identify anyone else who could pick up or care for M.M.

Ultimately, neither Mother nor Father took custody of M.M. on February 27. DCYF obtained an ex parte order to assume custody of M.M. and placed him in shelter care. On March 2, 2020, DCYF filed petitions of neglect against both Father and Mother. Mother did not contest the petition against her, and she is not a party to this appeal.

The adjudicatory hearing on the petition against Father was held over five days in June and July of 2020. See RSA 169-C:18 (Supp. 2020). The circuit court issued its adjudicatory order on August 3, in which it found that Father neglected M.M. for failing to take custody of him on February 27. See RSA 169-C:3, XIX(b), :18. Father filed a motion to reconsider, to which DCYF objected. The circuit court denied Father's motion. A telephonic dispositional hearing was held on August 31, and the circuit court issued its final dispositional order on September 13. See RSA 169-C:19 (2014), :21 (2014).

On September 17, Father attempted to file an appeal in the superior court in accordance with the language of RSA 169-C:28 as it existed when DCYF filed its neglect petition against him. However, on July 29, 2020, RSA 169-C:28 had been amended to eliminate de novo review of final dispositional orders in the superior court, effective July 1, 2020. See Laws 2020, 37:125. The superior court returned Father's appeal via a compliance notice instructing him to file his appeal with this court, citing the recent amendment to RSA 169-C:28. See id. This appeal followed.

II

We begin with Father's argument that he was erroneously deprived of his right to a de novo appeal to the superior court. At the time DCYF filed its petition of neglect against Father, RSA 169-C:28 read as follows:

4

I. An appeal under this chapter may be taken to the <u>superior court</u> by the child or the child's authorized representative or any party having an interest, including the state, or any person subject to any administrative decision pursuant to this chapter, within 30 days of the final dispositional order; but an appeal shall not suspend the order or decision of the court unless the court so orders. <u>The superior court shall hear the matter de novo, and shall give an appeal under this chapter priority on the court calendar.</u> For purposes of this chapter, a "final dispositional order" includes a dismissal of a petition for abuse and neglect by the district court. "Final dispositional order" shall also include any ruling or order arising from an administrative hearing held or initiated by any administrative agency, including the department, in which a finding of child abuse or neglect is made.

II. This section shall apply to all appeals under this chapter, including appeals in proceedings before the family division of the courts.

RSA 169-C:28 (prior version) (emphases added). <u>See generally</u> RSA 490-F:18 (Supp. 2020) (explaining that statutes which reference the jurisdiction of the district court or judicial branch family division are deemed to refer to the circuit court). As previously noted, on July 29, 2020, the emphasized language was amended, eliminating <u>de</u> <u>novo</u> review of a final dispositional order in the superior court, and instead directing appeals to this court. <u>See</u> Laws 2020, 37:125. The effective date of the amendment was specified as July 1, 2020. <u>See</u> <u>id</u>.

On appeal, Father asserts that this amendment should not apply to his case. He argues that his right to a <u>de</u> <u>novo</u> appeal in the superior court "vested as of the filing of the petition," that he was apprised of this right "at each stage of the proceedings," and that "this right informed trial strategy and attorney-client decision making." He further argues that the amendment affects substantive rights that are not "merely 'procedural' in nature" because a <u>de</u> <u>novo</u> appeal to the superior court "essentially provide[s] a respondent parent with a second opportunity to be heard, which is particularly important where parental rights are impacted."

Father's challenge presents a question of constitutional law and statutory interpretation, which we review <u>de</u> <u>novo</u>. <u>Polonsky v. Town of Bedford</u>, 173 N.H. 226, 230 (2020); <u>see</u> <u>State v. Lamarche</u>, 157 N.H. 337, 340 (2008) (the constitutionality of a statute as applied is a question of law). In matters of statutory interpretation, this court is the final arbiter of the intent of the legislature as expressed in the words of the statute considered as a whole. <u>In re D.O.</u>, 173 N.H. 48, 52 (2020). We first look to the language of the statute itself, and, if possible, construe that language according to its plain and

ordinary meaning.  Id.  We interpret legislative intent from the statute as written and will not consider what the legislature might have said or add language that the legislature did not see fit to include.  Id.  We construe all parts of a statute together to effectuate its overall purpose and avoid an absurd or unjust result.  Id.  Moreover, we do not consider words and phrases in isolation, but rather within the context of the statute as a whole, which enables us to better discern the legislature's intent and interpret statutory language in light of the policy or purpose sought to be advanced by the statutory scheme.  Id.

RSA 169-C:28 provides the statutory right of appeal from a final dispositional order in an abuse or neglect proceeding.  Id.; see Laws 2020, 37:125.  The term "final dispositional order" is a term of art referring to the order of the circuit court following its dispositional hearing.  In re J.H., 171 N.H. 40, 46 (2018); see RSA 169-C:21; RSA 490-F:18.  The statute is triggered by the issuance of a final dispositional order and prescribes the method for taking an appeal from such an order.  Laws 2020, 37:125; see In re D.O., 173 N.H. at 52 ("[T]he word ['may'] . . . refers to the discretion of the party who, having received a final dispositional order from the district court, may then decide whether or not to appeal it.").

In July 2020, the legislature amended the method of taking an appeal from a final dispositional order by replacing "superior court" with "supreme court" in the first sentence of paragraph I, beginning, "An appeal under this chapter may be taken to the," and removing the following sentence: "The superior court shall hear the matter de novo, and shall give an appeal under this chapter priority on the court calendar."  Laws 2020, 37:125.  Thus, RSA 169-C:28 now states, in pertinent part: "An appeal under this chapter may be taken to the supreme court by the child or the child's authorized representative or any party having an interest, including the state, or any person subject to any administrative decision pursuant to this chapter, within 30 days of the final dispositional order . . . ."  Id.

When the legislature enacted the amendment to RSA 169-C:28, it specified an effective date of July 1, 2020, but the legislature was otherwise silent as to whether the statute should apply prospectively or retrospectively. See id.  Therefore, our interpretation turns on whether the statute affects the parties' substantive or procedural rights.  State v. Fuller, 169 N.H. 154, 160 (2016).  In general, when a law affects substantive rights and liabilities, it is presumed to apply only prospectively.  Id.  This presumption, however, reverses when the statute is determined to affect only the procedural or remedial rights of a party.  Id.  Unlike statutes affecting substantive rights, those affecting procedural or remedial rights are presumed to apply retrospectively to cases that, on the effective date of the statute, have not yet gone beyond the procedural stage to which the statute pertains.  See id.  The final decision on a statute's prospective or retrospective application "rests on a determination of

6

fundamental fairness." Id. (quotation omitted). Such application does not offend the constitutional prohibition on retrospective laws. Petition of N.H. Sec'y of State, 171 N.H. 728, 735 (2019); see N.H. CONST. pt. I, art. 23.

"While there is no precise definition of either substantive or procedural law, it is generally agreed that a substantive law creates, defines and regulates rights while a procedural law prescribes the methods of enforcing such rights or obtaining redress." Petition of N.H. Sec'y of State, 171 N.H. at 736 (quotation omitted). Compare id. at 734-36 (holding right to discover voting database was procedural where trial court's decision granting plaintiffs' discovery request was a non-final discovery order and post-order amendment to the relevant law "addresse[d] the issue of discovery, a quintessentially procedural matter"), with Appeal of Silk, 156 N.H. 539, 542-43 (2007) (holding amendment to our Workers' Compensation Law regulating awards of attorney's fees and costs affected substantive rights because "attorney's fees and costs are inextricably intertwined with other substantive benefits in the workers' compensation setting"). Put another way, "the purpose of procedural law is to facilitate decision of the case on the merits." Petition of N.H. Sec'y of State, 171 N.H. at 736 (quotation omitted).

We disagree with Father that the amendment affects his substantive rights. One of the stated purposes of RSA chapter 169-C is to "provide effective judicial procedures through which the provisions of th[e] chapter are executed and enforced and which recognize and enforce the constitutional and other rights of the parties and assures them a fair hearing," RSA 169-C:2, III(c) (Supp. 2020), and RSA 169-C:28 serves this purpose, see Laws 2020, 37:125. See generally In re C.O., 171 N.H. 748, 755 (2019) ("Parental rights are 'natural, essential, and inherent' within the meaning of Part I, Article 2 of the New Hampshire Constitution."). RSA 169-C:28 establishes the procedure by which parties' respective rights are adjudicated in abuse and neglect proceedings on appeal from final dispositional orders. See Laws 2020, 37:125; see also Workplace Systems v. CIGNA Prop. & Cas. Ins. Co., 143 N.H. 322, 324-26 (1999) (explaining that statutory amendment permitting superior court to entertain declaratory judgment actions pertained to procedures by which parties' rights are adjudicated). The statute provides a means of facilitating decisions on the merits in abuse and neglect cases by prescribing the method of enforcing the substantive rights implicated by such proceedings and obtaining redress through an appellate process. See Laws 2020, 37:125; Petition of N.H. Sec'y of State, 171 N.H. at 736.

Father points to our decision in In re C.M. to support his argument that the loss of a de novo appeal to the superior court affects his substantive rights, emphasizing that the availability of de novo review "is particularly important where parental rights are impacted." In that case, we defined a de novo hearing as: "1. A reviewing court's decision of a matter anew, giving no deference to a lower court's findings. 2. A new hearing of a matter, conducted

as if the original hearing had not taken place." In re C.M., 166 N.H. 764, 774 (2014) (quotation omitted). We further described the de novo appeal that was afforded under the prior version of RSA 169-C:28 as giving an aggrieved party "an opportunity for a fresh look at the case by a different judge, who will consider the matter anew, unconstrained by the decision of the first judge." Id. at 775. However, we did so in the context of explaining why we disagreed with the parent-respondents' argument that such an appeal should always restart the twelve-month clock to correct the conditions of abuse or neglect. See id. While our reasoning in In re C.M. may highlight the form of review that the legislature eliminated from RSA 169-C:28 in July 2020, see id., we do not agree that our decision in that case supports Father's assertion that the loss of a de novo appeal to the superior court from a final dispositional order affects his substantive rights.

Nor are we persuaded that the legislature's change to the review available for a final dispositional order on appeal supports the argument that the amendment to RSA 169-C:28 affects substantive rights. See Laws 2020, 37:125. Under the amended statute, appeals from final dispositional orders under RSA chapter 169-C must be taken directly to this court. See id. Our established standard of review for final dispositional orders in abuse and neglect proceedings, which the legislature did not modify as part of the July 2020 amendment, see id., is as follows:

> "Our practice is to sustain the findings and rulings of the trial court unless they are unsupported by the evidence or tainted by error of law. The court, which is the trier of fact, is in the best position to assess and weigh the evidence before it because it has the benefit of observing the parties and their witnesses. Consequently, our task is not to determine whether we would have found differently; rather, we determine whether a reasonable person could have found as the trial judge did."

In re Thomas M., 141 N.H. 55, 57 (1996) (quoting In re Tracy M., 137 N.H. 119, 125 (1993)); accord In re Craig T., 144 N.H. 584, 585 (1999).

Although the amendment eliminates the ability to seek de novo review of a final dispositional order by intermediate appeal to the superior court, the legislature has changed only the procedure of enforcing the substantive rights implicated by abuse and neglect proceedings and of obtaining redress on appeal. See Laws 2020, 37:125; Petition of N.H. Sec'y of State, 171 N.H. at 736. The amendment does not "fundamentally change[] the relationship between the parties . . . in a fashion that significantly bears on the ultimate determination of their rights." Liberty Mut. Ins. Co. v. Home Ins. Indem. Co., 117 N.H. 269, 271 (1977) (describing the court's opinion in Merchants Mutual Insurance Co. v. Transformer Service Inc., 112 N.H. 360, 365 (1972), in which we held that a statutory amendment that shifted "the burden of establishing

8

coverage from the insured to his insurer" in the underlying declaratory judgment action affected substantive rights); see Laws 2020, 37:125. Compare Liberty Mut., 117 N.H. at 271, with In re Fay G., 120 N.H. 153, 155, 156 (1980) (holding that procedural change allowing probate court to order psychiatric evaluations in termination of parental rights cases properly applied retrospectively even though amendment could potentially affect State's ability to meet its burden).

For the reasons discussed, we conclude that RSA 169-C:28 is a procedural law and that the July 2020 amendment to it affects only procedural rights. See Laws 2020, 37:125; Smith v. Sampson, 114 N.H. 638, 641 (1974) (holding amendment did not affect substantive rights where "[w]hat is in issue and governed by the amended statute is the procedure to be followed by the plaintiff to appeal to the superior court the decision made of her possessory rights by the district court"); cf. Reisenberg v. State, 115 N.H. 12, 13 (1975) ("Statutes governing court review of the decisions of administrative bodies are generally regarded as procedural."); 16B Am. Jur. 2d Constitutional Law § 745, Westlaw (database updated Feb. 2021) ("[T]he general rule [is] that no ex post facto violation occurs because the state has enacted a different method of taking an appeal or other proceeding for a review.").

Accordingly, we conclude that the amendment to RSA 169-C:28 presumptively applies to cases that, as of its effective date of July 1, 2020, were pending but had not yet gone beyond the procedural stage to which RSA 169-C:28 pertains. See Laws 2020, 37:125; Fuller, 169 N.H. at 160 (statutes affecting procedural or remedial rights are presumed to apply retrospectively). The adjudicatory hearing was still being conducted in Father's case as of July 1, and the final dispositional order, which would trigger the statute, was not issued until September 13. See Laws 2020, 37:125; cf. Fuller, 169 N.H. at 160 (case must not have "gone beyond" the pertinent procedural stage). Therefore, the amendment presumptively applies to Father's case.

Father has not presented sufficient justification to rebut this presumption. See Fuller, 169 N.H. at 160; Eldridge v. Eldridge, 136 N.H. 611, 615 (1993) (our final decision rests on fundamental fairness). Although Father asserts that he was apprised of his rights under RSA 169-C:28 as it existed during the pre-amendment pendency of his case and that he relied upon that law as it then existed to inform his case preparations and strategy, we are not persuaded that these considerations make the application of the amended statute to his case fundamentally unfair; nor do these considerations change our conclusion that the amendment affects only procedural rights. See Petition of N.H. Sec'y of State, 171 N.H. at 735 ("Such application does not offend the constitutional prohibition on retrospective laws."); Eldridge, 136 N.H. at 614 (amendment opening new channel of inquiry into propriety of modifying child support orders applied to support obligation that preceded amendment's effective date); see also Workplace Systems, 143 N.H. at 325 ("In many

9

instances we have found proper the retroactive application of procedural or remedial statutes that may have altered the outcome of the controversy or subjected parties to criminal or civil actions which otherwise would have been barred.").

We also disagree with Father that he had a "vested" right to a de novo appeal in superior court as of DCYF's filing of its neglect petition against him, because:

> the individual citizen, with all his rights . . . , has no vested interest in the existing laws of the State as precludes their amendment or repeal by the legislature; nor is there any implied obligation on the part of the State to protect its citizens against incidental injury occasioned by change in the law.

In the Matter of Goldman & Elliott, 151 N.H. 770, 773 (2005) (quotation omitted); cf. 16B Am. Jur. 2d Constitutional Law § 745 ("There is no vested right in particular rules of evidence or in rules relating to jurisdiction of the court over parties to a lawsuit."). Citizens have no general right to the continuance of prior laws even when such laws are substantive. See Goldman, 151 N.H. at 774. "[A]t most, [Father] had a mere expectation based on an anticipation of the continuance of existing law that" he would be able to appeal a final dispositional order to the superior court for de novo review. Petition of N.H. Sec'y of State, 171 N.H. at 735 (quotation omitted). "Such expectancy is not sufficient to establish a vested right." Id. The fact that Father was apprised of and relied upon the prior version of RSA 169-C:28 does not change this conclusion. See Goldman, 151 N.H. at 773; see also Petition of N.H. Sec'y of State, 171 N.H. at 734-35.

The application of RSA 169-C:28 as amended in July 2020 to Father's case does not violate the constitutional prohibition on retrospective laws, see N.H. CONST. pt. I, art. 23, and, therefore, we hold that he was not erroneously deprived of the right to appeal to the superior court for de novo review. To the extent that Father challenges the application of the amended statute to his case on additional grounds, including that its application violated his constitutional rights to due process and equal protection, we conclude that any such arguments are insufficiently developed, see State v. Blackmer, 149 N.H. 47, 49 (2003), and otherwise do not warrant further discussion, see Vogel v. Vogel, 137 N.H. 321, 322 (1993).

III

We now turn to our review of Father's appeal from the final dispositional order on DCYF's neglect petition against him. See Laws 2020, 37:125. Father first contends that the circuit court "should have declined to make orders [on DCYF's neglect petition] in the first instance in light of the ongoing CHINS

10

matter, which could have addressed placement and other issues." (Capitalization and bolding omitted.)  See generally RSA ch. 169-C (2014 & Supp. 2020) (the Child Protection Act — the statutory framework for abuse and neglect proceedings); RSA ch. 169-D (2014 & Supp. 2020) (CHINS statutory framework).

Father has not identified, nor have we found, any provision of either the Child Protection Act or the CHINS statutory framework that supports his position that the existence of an ongoing CHINS case does or should preclude the filing and/or evaluation of a petition alleging abuse or neglect.  See, e.g., RSA 169-C:7 (2014) (setting forth the requirements for filing an abuse or neglect petition); RSA 169-C:2, I (Supp. 2020) (contemplating "the mandatory reporting of suspected instances of child abuse or neglect"); see also RSA 169-D:9, IX (Supp. 2020) (providing that statements made by the child during discussions or conferences incident to CHINS voluntary family services plan "may be reported as the basis for a referral to the department pursuant to RSA [chapter] 169-C, if there is reasonable basis to believe that a child's physical or mental health or welfare is endangered by abuse or neglect").  Although Father claims that "it would have been far more beneficial, reasonable, and appropriate to seek emergency orders in the CHINS case," he provides no legal authority or argument establishing that the circuit court, or DCYF, erred.  See Blackmer, 149 N.H. at 49 (stating that complaints regarding adverse rulings without developed legal argument do not warrant judicial review).

Father alternatively argues that, even if DCYF's neglect petition was properly before the circuit court, there was insufficient evidence to support the circuit court's finding of neglect against him.  We disagree.

DCYF must prove neglect by a preponderance of the evidence.  See RSA 169-C:13 (2014).  A "neglected child" is defined by statute, in relevant part, as a child

> [w]ho is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health, when it is established that the child's health has suffered or is likely to suffer serious impairment; and the deprivation is not due primarily to the lack of financial means of the parents . . . .

RSA 169-C:3, XIX(b).  The statute defines "[s]erious impairment" as "a substantial weakening or diminishment of a child's emotional, physical, or mental health or of a child's safety and general well-being."  RSA 169-C:3, XXVII-a (Supp. 2020).  As discussed, we will sustain the circuit court's findings and rulings unless they are unsupported by the evidence or tainted by error of law.  In re Thomas M., 141 N.H. at 57.  The circuit court, as the trier of fact, is in the best position to assess and weigh the evidence before it because it has

the benefit of observing the parties and their witnesses.  Id.  Consequently, our task is not to determine whether we would have found differently; rather, we determine whether a reasonable person could have found as the trial judge did.  Id.

There was sufficient evidence to support the circuit court's finding that DCYF proved by a preponderance of the evidence that Father neglected M.M.[1] Father appears not to dispute on appeal that M.M. is "seriously impaired" pursuant to the statute, see RSA 169-C:3, XIX(b), but argues that "M.M.'s impairments" do not result from any failure of his as M.M.'s parent.  He contends that his failure to pick up M.M. on February 27 was not neglect because there was "no clear connection established between [him] not picking up [M.M.] from St. Joseph['s] Hospital and M.M.'s impairments."  In making this argument, we believe Father may have conflated the fact that M.M. has underlying mental health and behavioral conditions with the statutory concept of "serious impairment" that is at issue here in the context of M.M. having no one to care for him upon being ready for discharge from the hospital.  See RSA 169-C:3, XIX(b), XXVII-a.

We acknowledge that Father may not have, for example, caused M.M.'s underlying conditions, been involved in the incident at Mother's home that directly led to M.M.'s admission to St. Joseph's Hospital on February 18, or caused Mother to refuse to take custody of M.M. on February 27.  However, such facts are not dispositive of whether Father neglected M.M. by declining to take M.M. home or otherwise ensuring that M.M. had somewhere safe to go when he was ready to be discharged from the hospital.  See RSA 169-C:3, XIX(b); In re J.H., 171 N.H. at 49; see also In re Samantha L., 145 N.H. 408, 413 (2003) (concluding that removing child, found to be abused and neglected, from mother's custody was not error even though mother did not cause abuse because mother "shirk[ed] the responsibility to assist [her] child in coping with abuse" and was "unwilling to take steps to remedy the consequences of the abuse"); In re Craig T., 144 N.H. at 557-58 (concluding there was sufficient evidence that mother neglected both son and daughter when she failed to intervene when father physically abused son and she "did nothing to protect [daughter] from witnessing the assault" of son).

"[S]tatutory neglect is not the actions taken or not taken by the parent or parents, but rather 'it is the likelihood of or actual serious impairment of the child's physical, emotional, and mental well being that are the conditions of neglect that must be repaired and corrected in the [circuit] court process.'"  In

---

[1] Father states on appeal that the circuit court should have stricken certain paragraphs from DCYF's petition as irrelevant because they contained information about two reports against Father from 2013, involving M.M., both of which DCYF determined to be unfounded.  He offers no further argument on this point, and we decline to address arguments that are insufficiently developed.  See State v. Blackmer, 149 N.H. 47, 49 (2003).

re J.H., 171 N.H. at 49 (quoting In re Juvenile 2006-674, 156 N.H. 1, 5 (2007)); see RSA 490-F:18. "Thus, the circumstances surrounding the underlying neglect petition that the parents must remedy include the circumstances that threaten or actually cause serious impairment to the child's physical, mental, or emotional health." In re J.H., 171 N.H. at 49 (brackets, citations, and quotations omitted).

Regardless of the fact that the circumstances leading up to and surrounding M.M.'s admission to St. Joseph's Hospital and M.M.'s readiness for discharge on February 27 were due, in part, to conditions beyond Father's immediate control, M.M. was in basic need of a safe shelter when he was ready to be discharged from the hospital. See Clarke v. Clarke, 128 N.H. 550, 551 (1986) (per curiam) (explaining food and shelter are among "the basic necessities of [a] child's survival"). Children are dependent on their parents for physical and emotional health and safety, In re Craig T., 144 N.H. at 587, including their need for a safe shelter, see Clarke, 128 N.H. at 551. See also In re O.D., 171 N.H. 437, 438-39 (2018) (stating that neglect petition was filed for, inter alia, failing "to secure safe and appropriate housing for the children," that the children were found to be neglected, and that "the first objective [of DCYF's post-dispositional-order case plan] included that the parents will locate and secure appropriate housing for the children"); In re C.M., 166 N.H. at 768-70 (stating that the children were found to be neglected, in part due to an unsafe and unsanitary home environment, and that the dispositional order required parents to demonstrate, inter alia, "the ability to obtain and maintain a safe and sanitary home"); cf. RSA 169-C:3, XVII(d) (Supp. 2020) (defining "[l]egal custody," in part, as "[t]he responsibility to provide the child with food, clothing, shelter, education, emotional security and ordinary medical care").

The circuit court acknowledged and appreciated the challenging circumstances facing the families in this case; however, it could not, nor can we, ignore that Father had and has a responsibility to provide M.M. with safe shelter as his parent. See, e.g., Matter of Jaheem M., 174 A.D.3d 610, 611 (N.Y. App. Div. 2019) ("The father's failure to provide adequate shelter, by itself, is sufficient to support the finding of neglect."); In Interest of M.K., 649 N.E.2d 74, 79 (Ill. App. Ct. 1995) ("Parents have the duty to protect their children from harm, and their refusal to provide their children with safe and nurturing shelter clearly falls within the concept of statutory neglect."); see also In re Samantha L., 145 N.H. at 413 ("Parental responsibilities come in many forms, some requiring the active involvement of the child's parent." (quotation omitted)).

The circuit court found that M.M. and his parents had received services through M.M.'s CHINS case, "with the goal of returning [M.M.] home to live with either Mother or Father," and that the CHINS case was, after approximately two years, "coming to a close" when M.M. was ready to be discharged. Although Father argues on appeal that he was "actively involved"

in M.M.'s CHINS case, the circuit court found that Father "failed to follow through or delayed acting on the majority of [DCYF's] recommendations." Father maintains that it was "entirely reasonable and appropriate" for him to decline to take custody of M.M. given the existing CHINS orders and the police officer's safety plan; however, the circuit court found that these perceived barriers did not obviate Father's parental responsibilities to M.M. when M.M. was ready to be discharged from the hospital without anywhere else to go. Furthermore, as the circuit court explained, Father also asserted that the 2015 parenting plan restriction preventing his wife from having unsupervised contact with M.M. was "a barrier to [M.M.] being placed in his care and custody," and he argues on appeal that he "made a good faith attempt to modify the parenting plan." Yet, the circuit court found that Father did not "reopen[] the parenting case to revisit and/or modify the 2015 parenting orders which imposed these restrictions" on his wife having unsupervised contact with M.M. The circuit court's findings are supported by the record. See In re Thomas M., 141 N.H. at 57 (having the benefit of observing the parties and other witnesses, the circuit court is in the best position to assess and weigh the evidence); see also In re J.H., 171 N.H. at 49 (parents must remedy circumstances surrounding the underlying neglect petition that threaten or actually cause serious impairment to the child's physical, mental, or emotional health); In re Craig T., 144 N.H. at 587; Clarke, 128 N.H. at 551.

M.M. was in basic need of a safe shelter when he was ready to be discharged from St. Joseph's Hospital on February 27. The record supports the circuit court's findings that DCYF proved by a preponderance of the evidence that Father's refusal to take custody of M.M., or to otherwise arrange a safe place for his son to go, demonstrated a lack of proper parental care or control necessary for M.M.'s physical, mental, or emotional health, established that M.M.'s health had suffered or was likely to suffer serious impairment, and that the deprivation was not due primarily to the lack of Father's financial means. RSA 169-C:3, XIX(b); see In re J.H., 171 N.H. at 49; see also In re Samantha L., 145 N.H. at 413. Therefore, we hold that the circuit court did not err in finding that Father neglected M.M. See In re Thomas M., 141 N.H. at 57 (we will sustain the circuit court's findings and rulings unless they are unsupported by the evidence or tainted by error of law).

IV

In sum, we conclude that the legislature's 2020 amendment to RSA 169-C:28, eliminating de novo review of final dispositional orders in superior court and instead directing appeals here, applies to Father's case which was pending but had not yet gone beyond the procedural stage to which the statute pertains when the amendment became effective on July 1, 2020. See Laws 2020, 37:125; Fuller, 169 N.H. at 160. Additionally, we conclude that the circuit

14

court did not err in considering and issuing orders on DCYF's neglect petition despite M.M.'s open CHINS case and that there was sufficient evidence to support the circuit court's finding of neglect against Father.

All issues raised in Father's notice of appeal, but not briefed, are deemed waived. In re K.H., 167 N.H. 766, 774 (2015).

Affirmed.

HICKS, BASSETT, and DONOVAN, JJ., concurred.

15