NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by email at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: https://www.courts.nh.gov/our-courts/supreme-court

THE SUPREME COURT OF NEW HAMPSHIRE

_____

8th Circuit Court-Keene Family Division
Nos. 2022-0543
      2022-0546


IN RE E.R.; IN RE H.R.

Argued: April 25, 2023
Opinion Issued: June 29, 2023


John M. Formella, attorney general, and Anthony J. Galdieri, solicitor general (Laura E. B. Lombardi, senior assistant attorney general, on the brief and orally), for the New Hampshire Division for Children, Youth and Families.

Nixon Peabody LLP, of Manchester (W. Daniel Deane and Erin S. Bucksbaum on the brief, and Erin S. Bucksbaum orally), and CASA of New Hampshire, of Manchester (Betsy Paine on the brief), for Court Appointed Special Advocates of New Hampshire.

Evans Law Firm, of Keene, for the mother, filed no brief.

MACDONALD, C.J. The New Hampshire Division for Children, Youth and Families (DCYF) and Court Appointed Special Advocates of New Hampshire (CASA) appeal an order of the Circuit Court (Ryan, J.) denying DCYF's petitions to terminate the mother's parental rights over E.R. and H.R. We affirm.

I.  Background

The following facts are supported by the record.  The mother has five children; E.R. and H.R. are the youngest.  The fathers of E.R. and H.R. are unknown.  In November 2019, the Circuit Court (Forrest, J.) found, pursuant to an adjudicatory consent order, that the mother neglected four of her children, including E.R. and H.R.  See RSA 169-C:17 (2022).  The court found that the children were neglected due, in relevant part, to the following: "unsanitary housing conditions, unlau[n]dered clothing, issues with home not having oil, and water and plumbing issues.  The children are reported to have an odor and wearing the same clothes for days in a row."  Pursuant to this order, the mother was required to maintain safe, sanitary, healthy, appropriate, and consistent housing.  If necessary, she was to sign releases to allow DCYF to speak with her landlord.  She was to work with providers to remove unnecessary trash, obtain oil and working appliances, maintain running water, launder clothing, and improve pest and mold control.  She and the children were to engage in mental health assessments.  Medical and dental services were also to be conducted routinely for E.R. and H.R.  DCYF was granted legal supervision of the children, but they remained in the mother's care.

The oldest of the four children later turned eighteen during the neglect matter, and one of the other children was placed with her biological father.  Thus, only the proceedings as to E.R. and H.R. are relevant to these appeals.

The circuit court held a dispositional hearing in December 2019.  See RSA 169-C:19 (2022).  DCYF filed a case plan and the CASA guardian ad litem (GAL) filed a dispositional hearing report.  The court adopted DCYF's case plan in its entirety.  The requirements set forth for the mother mirrored those specified in the adjudicatory consent order.  At this time, E.R. was five years old and H.R. was eight years old.

The circuit court held a three-month review hearing in March 2020.  See RSA 169-C:24 (2022).  The court found the mother to be in partial compliance with the dispositional order.  The mother had made several improvements: she changed her work schedule from third to first shift, filled a dumpster provided by DCYF and had a second one planned, signed authorizations and releases for her children's doctors and dentists, engaged with Home Based Collaborative (HBC) services, and improved communication with the school.  However, H.R.'s attendance and behavior at school remained problematic, including an incident where he ran out of the school and police involvement was required.  E.R.'s teacher reported no concerns.  The children remained in the mother's care.

The Circuit Court (Forrest, J.) held a six-month review hearing in July 2020 and found the mother to be in partial compliance.  Both E.R. and H.R. failed to participate in remote learning.  The mother quit her job to be home with the children because of the COVID-19 pandemic and filled a second

dumpster. However, she failed to participate in a mental health evaluation. While the home had adequate food, water, and electricity during one announced visit, the mother did not cooperate to set up additional visits. The children again remained in the mother's care.

The circuit court held a nine-month review hearing in October 2020 and found the mother to be in partial compliance. E.R. and H.R. were again appearing at school with a foul odor and were falling asleep. H.R. continued to elope from school, requiring the intervention of law enforcement. The mother claimed that he did not exhibit similar issues at home; however, both DCYF and CASA reported that H.R. would leave the home when he got mad and sleep in the car. The mother claimed that she had not been made aware of these issues; the school reported that attempts to contact her had been unsuccessful. The mother also did not consistently communicate with the child protective services worker (CPSW). Both the GAL and CPSW observed trash in the home and the CPSW indicated that the home was "infested" with flies, which the mother denied. The CPSW noted that despite the lack of hot water, there was running water, electricity, and a refrigerator. The mother did not engage in a mental health evaluation and inconsistently participated with HBC. The court transferred legal custody to DCYF, and E.R. and H.R. were removed from the mother's care.

The circuit court held a twelve-month review hearing in January 2021 and again found the mother to be in partial compliance. The school reported that the children's behavior had improved greatly since being placed in foster care. However, their foster placement was changed due to a behavioral problem with H.R. The mother attended the children's medical appointments and both children had significant dental issues. Communication from the mother remained inconsistent and she refused at least one home visit. During one home visit there were piles of dirty dishes on the countertops and excessive garbage. There was no heat in the kitchen or downstairs bathroom. The mother refused DCYF's request for a signed release to speak with her landlord, claiming that she was planning to move. Ten attempts were made to refer her to the "Roadmaps to Reunification" program, but all were unsuccessful. E.R. and H.R. remained in foster care.

The circuit court held a fifteen-month review hearing in April 2021 and found the mother to be in partial compliance. The children continued to do well in school. The mother completed a psychological evaluation with Dr. Bluhm, who concluded that "[g]iven [the mother's] multiple limitations in capacities and motivation, this evaluator cannot with any optimism recommend interventions (e.g. counseling, psychotropic medications, parenting classes) that would be likely to improve her parenting skills." The mother consistently attended therapy sessions. Although the mother did not consistently communicate with the GAL, her communication with the CPSW improved as had her participation with HBC. She attended all visits with E.R.

3

and H.R. and parented appropriately.  The CPSW visited the home twice and learned that there was no heat or hot water and that a space heater was being used.  The town health inspector was involved.  The home was, however, free from garbage.  E.R. and H.R. remained in foster care.

The circuit court held an eighteen-month review hearing in July 2021 and found the mother to be in partial compliance.  The children continued to do well in their foster home.  DCYF indicated that the mother's communication with HBC had improved but remained an issue.  Her communication with the CPSW had declined and she refused to provide the address of the new house she was staying at, claiming that it was not her residence.  She was also no longer in therapy.  The mother consistently attended visits with E.R. and H.R. and parented appropriately during that time.  E.R. and H.R. remained in foster care.

In October 2021, the circuit court held a permanency hearing.  Both DCYF and CASA recommended adoption as the permanency plan and termination of the mother's parental rights over E.R. and H.R.  The GAL reported a lack of communication from the mother and DCYF reported that she had stopped working with HBC.  E.R.'s behavioral issues had returned, including refusing to eat and being aggressive at camp such that he was expelled.  E.R. told the GAL that he behaved this way because he missed his mother.  During a visit with the mother, E.R. began crying and expressed a desire to live in their old home where they had many of their toys.  The circuit court ordered a permanency plan of adoption and directed DCYF to file petitions to terminate the mother's parental rights.  The court reasoned:

> [W]hile [the mother] clearly expresses her love of her children, over the nearly two year life of this case she has shown only nominal compliance with the dispositional orders, and, based on Dr. Bluhm's evaluation, there is little likelihood that her request for a three month extension will result in any meaningful changes in her circumstances, with the possible exception of an improvement in her housing situation.

Subsequently, DCYF filed petitions to terminate the mother's parental rights over E.R. and H.R. on the ground that "[s]ubsequent to a finding of child neglect or abuse under RSA 169-C, the parents have failed to correct the conditions leading to such a finding within 12 months of the finding despite reasonable efforts under the direction of the court to rectify the conditions."  RSA 170-C:5, III (Supp. 2022).  The Circuit Court (Ryan, J.) held a hearing on these petitions in July 2022.  Several witnesses testified, including the mother, the principal of the children's school, a DCYF supervisor (the CPSW involved had since relocated to another state), the GAL, the mother's fiancé, and two older siblings of E.R. and H.R.

4

The circuit court denied the petitions to terminate the mother's parental rights over E.R. and H.R. The court found beyond a reasonable doubt that the mother failed to correct the undisputed conditions of neglect within twelve months of the finding. The court also found that DCYF made reasonable efforts to assist the mother in correcting the conditions. However, the court concluded that while it is in the children's best interest to remain out of their mother's care, it is not in their best interest that her parental rights be terminated. The court could not find, "based upon their prior life and bond with their mother, that potentially removing her, and their siblings, from their lives during their minority is in their best interests." The court found that the children's best interest "require[s] substitution or supplementation of parental care and supervision." Thus, "[p]ursant to RSA [chapter] 170-C," the court awarded guardianship to the department of health and human services and ordered that the mother "shall be responsible for temporary child support."

DCYF and CASA filed motions for reconsideration, which the circuit court denied. These appeals followed.

II. Analysis

RSA chapter 170-C sets forth the statutory framework governing termination of parental rights. We have long recognized that the right to raise and care for one's children is a fundamental liberty interest protected by the State Constitution, Petition of Kerry D., 144 N.H. 146, 149 (1999), and that "[t]he loss of one's children can be viewed as a sanction more severe than imprisonment," In re Baby K., 143 N.H. 201, 205 (1998). The purpose of RSA chapter 170-C is to establish a judicial process for involuntary termination of those fundamental parental rights that "will safeguard the rights and interests of all parties concerned and when it is in the best interest of the child." RSA 170-C:1 (2022). Essential to this statutory scheme is "the philosophy that whenever possible family life should be strengthened and preserved." Id. Therefore, before a court may order the termination of parental rights, the petitioning party must prove a statutory ground for termination beyond a reasonable doubt. In re R.H., 174 N.H. 332, 338 (2021).

Once a statutory ground for termination of parental rights is established, the court must then consider whether termination, or some alternative dispositional order, is in the child's best interest. See In re Sophia-Marie H., 165 N.H. 332, 336 (2013). Unlike the statutory ground for termination, this element does not require proof beyond a reasonable doubt. See In re Shannon M., 146 N.H. 22, 28 (2001). The dominant consideration is the welfare of the child, which prevails over the interests of the parents. In re Adam R., 159 N.H. 788, 792 (2010). We will affirm the circuit court's order unless it is unsupported by the evidence or erroneous as a matter of law. In re K.H., 167 N.H. 766, 771 (2015).

DCYF and CASA argue that the trial court erred as a matter of law in concluding that terminating the mother's parental rights was not in the children's best interest. Specifically, DCYF argues that "[i]n reaching its best interest determination, the court failed to apply the proper legal standard, which requires the court to consider which of the possible alternative dispositions is the most desirable for the children." DCYF interprets the best interest legal standard to mean that the court must choose between the four alternative dispositions listed as permanency plan options in the context of RSA chapter 169-C: reunification, adoption, guardianship, or "[a]nother planned permanent living arrangement." See RSA 169-C:24-b, II(a) (2022). DCYF contends that because E.R. and H.R. are under sixteen years of age, an alternative planned permanent living arrangement is not available to them. DCYF also asserts that a possible guardian was not identified for either child. Because the circuit court found that reunification is not in the children's best interest, DCYF contends that "adoption is the only legally permissible disposition available for [the children]."

However, the scope of dispositions available following a petition for termination of parental rights is not so narrow. Rather, the statute specifically provides for the outcome reached by the circuit court here:

> Where the court does not order termination of the parent-child relationship, it shall dismiss the petition; provided, however, that where the court finds that the best interest of the child requires substitution or supplementation of parental care and supervision, it shall make an order awarding guardianship with the department of health and human services or an authorized agency and fixing responsibility for temporary child support.

RSA 170-C:11, IV (2022). In accordance with RSA 170-C:11, IV, the circuit court (1) did not order termination of the mother's parental rights, (2) found that the best interest of the children requires substitution or supplementation of parental care and supervision, (3) awarded guardianship to the department of health and human services, and (4) ordered that the mother shall be responsible for temporary child support. Contrary to DCYF's assertion, adoption was not the only legally permissible disposition available for the children.

DCYF and CASA contend that guardianship with DCYF is not a viable permanency plan and contradicts the concept of permanency. Yet, as we have previously explained, "when a child's permanency plan under RSA 169-C:24-b, II is adoption and termination of parental rights, and when the court denies the termination petition under RSA 170-C:11, IV, a new permanency hearing must be held to 'review, modify, and/or implement the permanency plan or to adopt the concurrent plan.'" Petition of N.H. Div. for Children, Youth and Families, 170 N.H. 633, 642 (2018) (quoting RSA 169-C:3, XXI-b (2022)). "As the statute

6

provides, the court must then hold subsequent permanency hearings as long as the child remains in an out-of-home placement and must determine 'whether the department has made reasonable efforts to finalize the permanency plan that is in effect.'" Id. (quoting RSA 169-C:24-c, II (2022)). Indeed, DCYF represented to this court during oral argument that a second permanency hearing has been held and new termination petitions have been filed.

Thus, under these circumstances, there is no indication that the guardianship awarded to the department of health and human services is a permanent resolution. As we have previously observed, "where the permanency goal of termination and adoption has failed, the matter must return to the child protection case for the court to determine a new permanency plan, and doing so is not inconsistent with the plain language of RSA 170-C:11, IV." Id. at 641 (quotations omitted).

DCYF and CASA also contend that the circuit court erred in reasoning that "[a]doption may be contemplated in this case but it is not a certainty, particularly because of the very recent change in foster placement combined with the [children's] behavior in other foster placements." We have previously held that the "contemplation of adoption for a child is one factor to be considered when determining a child's best interest in RSA chapter 170-C termination proceedings, not a prerequisite to those proceedings." In re John Kevin B., 129 N.H. 286, 289 (1987). While the circuit court did find that adoption "is not a certainty" in this case, it is only one of several factors that the court considered.

DCYF further asserts that the circuit court erred because the question before it "was not whether continued contact with Mother would be in the boys' best interest, but, rather, which permanent disposition outside the foster care system was most desirable for [H.R.] and [E.R.]." However, our review of the order indicates that the circuit court followed the best interest standard, which asks whether termination, or some alternative dispositional order, is in the child's best interest. See In re Sophia-Marie H., 165 N.H. at 336. Indeed, the circuit court reasoned that:

> Were the question to be asked whether [H.R.] and [E.R.] should be returned to the care of [the mother], the Court would answer in the negative. However, the standard is not whether or not the children should be returned to the care of their mother. The standard is their best interest. It does not necessarily follow that, because they should not be returned to their mother at present, that her rights should be terminated.

Moreover, the circuit court reached this determination by considering the welfare of the children, not by prioritizing the mother's interest. See In re

7

Adam R., 159 N.H. at 792. The court found, and the record reflects, that E.R.'s "behavior in the foster home and elsewhere has not been without issue," largely due to the separation of E.R. from the mother. The court reasoned that although the children "have improved while in foster care, their lives in foster care, while more stable, have not been wholly stable." CASA argues that when determining the best interest of children, "the interests of preserving family unity must yield to the more compelling interest in ensuring the safety and welfare of children." CASA further observes that "children thrive when placed in a stable environment and the Division is not meant to be a parental unit providing the necessary stability and guidance for young children." However, as the court found, a successful, stable placement had not been found for the children at the time that the court denied DCYF's petitions.

In addition, DCYF and CASA contend that the circuit court's best interest determination was unsupported by the evidence. We disagree. The circuit court considered each of the GAL's bases for her recommendation and explained why it disagreed based on the evidence. The court acknowledged that the mother did not comply with the majority of the court's orders but emphasized that "[t]hese children are not infants and, until they were removed from their mother's care in October, 2020, she was the only parent they had known. Because their father is unknown, [the mother] had for their entire lives to that point, been their only parent." The court also noted that the mother "always exercised her parenting time and was appropriate in her behavior and parenting during those visits." (Emphases in original.) Given these circumstances, the court "respectfully disagree[d] with the recommendation of the GAL" because it could not find that, "based upon their prior life and bond with their mother, that potentially removing her, and their siblings, from their lives during their minority is in their best interests." The court concluded that "[i]t IS in their best interests to remain out of [the mother's] care; however, not to have her fundamental parental rights terminated."

The termination of a parent's legal bond to a child is a solemn and irreversible event. In re Adam R., 159 N.H. at 802. Our task on appeal is not to determine whether we would have found differently than did the circuit court, but to determine "whether a reasonable person could have found as the trial judge did." In re K.H., 167 N.H. at 773 (quotation omitted). Upon this record, the circuit court's finding that terminating the mother's parental rights was not in the children's best interest is supported by the evidence.

Accordingly, we affirm the circuit court's denial of the petitions to terminate the mother's parental rights over E.R. and H.R.

Affirmed.

HICKS, BASSETT, HANTZ MARCONI, and DONOVAN, JJ., concurred.

8